UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

**CASE NO.:**

PALM COURT AT 23RD STREET, LTD, a
Florida limited partnership

        Plaintiff,

v.

2901 JMH, LLC, a Delaware limited liability
company and JASON HALPERN, individually

        Defendants.

_____/

## **COMPLAINT**

Plaintiff, PALM COURT AT 23RD STREET, LTD ("Palm Court"), by and through its

undersigned counsel, hereby sues 2901 JMH, LLC and JASON HALPERN (collectively

"Defendants"), and alleges:

## **PARTIES, JURISDICTION & VENUE**

1.    This is an action for breach of contract and breach of guaranty. The damages

sought are in an amount that exceeds Seventy Five Thousand Dollars ($75,000.00) exclusive of

interest, costs and attorneys' fees, for which this Court has jurisdiction.

2.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, based

upon the diverse citizenship of the parties and the amount in controversy, which exceeds

$75,000.00, exclusive of interest and costs.

3.    Plaintiff, PALM COURT AT 23RD STREET, LTD ("Palm Court") is a Florida

limited partnership with its principal place of business located in Miami-Dade County.

4.      Defendant 2901 JMH, LLC ("2901 JMH") is a Delaware limited liability company, organized and existing under the laws of Delaware, and authorized to conduct business in Florida. 2901 JMH also owns real property in Miami-Dade County, Florida.

5.      Defendant, JASON HALPERN ("Halpern") is an individual over the age of eighteen, is a resident of Kings County (Brooklyn), New York, is doing business in Miami-Dade County, and is otherwise *sui juris.*

6.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to Palm Court's claims occurred in Miami-Dade County, Florida; the property which was leased to Defendants is situated in Miami-Dade County, Florida; Defendants do business in Miami-Dade County, Florida, the conduct of Defendants has resulted in actionable conduct in this judicial district; all payments were due in Miami-Dade County Florida; and the parties agreed in writing that the proper venue for the purposes of enforcing the contract and guaranty would lie in Miami-Dade County, Florida.

## GENERAL ALLEGATIONS

7.      Palm Court is an entity that owns commercial real estate in Miami-Beach, Florida located at 309 23 ST Miami Beach, FL 33139 (the "Property").

8.      2901 JMH is a development company that was seeking to develop a luxury condominium on nearby property it owns that is located at 2901-2911 Indian Creek Dr, Miami Beach, FL 33140.

9.      2901 JMH sought to establish a new condominium sales and marketing offices for the exclusive sale of its condominium project.

10.     On or about November 2, 2015, Palm Court entered into a two (2) year written commercial and non-residential lease with 2901 JMH (the "Lease"), pursuant to which Palm

Court agreed to lease improved portions of the Property located at 309 23 ST, Suite 100, Miami Beach, FL 33139 (the "Premises"), and in exchange 2901 JMH agreed, *inter alia*, to pay rent in accordance with the terms thereof, modify the Premises and complete certain tenant improvements specific for its use, and, prepare and complete other portions of the Premises that were to be delivered back to Palm Court in operational, vacant and broom clean condition as required in the "Final Plans" as such term is defined in section 33(a) of the Lease (the "Tenant's Work"). A true and correct copy of the written Lease is attached hereto as Exhibit "A".

11.     To induce Palm Court to enter into the Lease agreement, for consideration received, Halpern executed a Guaranty in favor of Palm Court to guarantee the performance of 2901 JMH obligations under the Lease. *See* Exhibit F of the Lease agreement.

12.     Palm Court has fully performed its obligations under the Lease.

13.     The monthly rental payments due under the Lease is approximately $17,814.97.

14.     On or about January 5, 2016, 2901 JMH took possession of the Premises.

15.     The Premises was delivered by Palm Court in a substantially improved and fully operational condition.

16.     Thereafter, 2901 JMH began employing professionals to begin the tenant improvements as required by section 33(a) of the Lease, and applied for the required building permit to perform its Tenant Work to modify the Premises for its specific use.

17.     With no notice, and without securing approval of Palm Court, and prior to 2901 JMH's providing Palm Court the Final Plans as required under the Lease, 2901 JMH commenced substantial demolition of the Premises, rendering the Premises unusable.

18.     Shortly thereafter, 2901 JMH intentionally failed to expedite the processing of its plans and ceased pursuit of the required building permit.

19.     Sometime in May, 2016, 2901 JMH had a change of heart regarding the sale and marketing of its condominium project, stopped paying rent and abandoned the leased Premises in the subject Property.

20.     2901 JMH left the Premises in an unusable, demolished state, replete with construction debris and without completing its required Tenant Work.   The Lease required that 2901 JMH be responsible for all costs and expenses in connection with Tenant's Work.

21.     2901 JMH has defaulted under the Lease agreement by failing to timely and fully pay rent due for the month of May 2016 and every month thereafter.

22.     In addition to the non-payment of rent, 2901 JMH has defaulted under the Lease agreement by failing to complete the Tenant's Work and/or pay the costs to complete the Tenant's Work. Palm Court estimates that the cost to perform the Tenant's Work easily exceeds $75,000.00

23.     On July 15, 2015, Palm Court, through counsel, served Defendants with a written notice of default (the "Default Notice"). A true and correct copy of the Default Notice is attached hereto as Exhibit "B."

24.     Since Palm Court's service of the Default Notice upon Defendants, additional rent has accrued under the Lease, which also has not been paid by Defendants.

25.     All conditions precedent to maintaining this action have either occurred, been excused, or have otherwise been waived.

26.     Palm Court has retained the undersigned attorneys to represent it in this action, and is obligated to pay these attorneys a reasonable fee for their services rendered.

## COUNT I – BREACH OF CONTRACT
## (AGAINST 2901 JMH)

27.     Palm Court realleges and incorporates the allegations in paragraphs 1 through 26 as if fully set forth herein.

28.     The parties entered in to a written lease for Unit 100.  *See* Exhibit A.

29.     2901 JMH has materially breached its obligations under the Lease by, *inter alia,* failing to pay the May 2016 rent, all other subsequent rent payments ("Rent") as defined and required under the Lease, and failing to complete the Tenant's Work and/or pay the costs to complete the Tenant's Work.

30.     Plaintiff has incurred damages as a direct and proximate result of 2901 JMH's defaults under the Lease.

31.     The Lease provides the Plaintiff with the right to take possession of the Premises, and to accelerate full payment of all future amounts due under the Lease.

32.     Palm Court has elected to take possession of the Premises and to recover a payment of accelerated rent and other damages (including but not limited all costs required to complete the Tenant's Work as such term is defined in section 33(a) of the Lease).

WHEREFORE, it is respectfully requests that this Court enter judgment in favor of Palm Court and against Defendant 2901 JMH for damages, plus interest, cost, and attorneys' fees, and such further relief as this Court deems just and proper.

<u>**COUNT II- ACTION ON PERSONAL GUARANTEE**</u>
<u>**(AGAINST HALPERN)**</u>

33.     Palm Court realleges and incorporates the allegations in paragraphs 1 through 32 as if fully set forth herein.

34.     In consideration for Palm Court's agreement to enter into the Lease for unit 100 with 2901 JMH, Halpern executed a guaranty pursuant to which he guaranteed to Palm Court "… the due and prompt performance by Tenant of 'Tenants Work' (as such term is defined in

Section 33(a) of the Lease), in accordance with and subject to the terms and conditions of the Lease, including, without limitation, any applicable notice and cure periods and the completion of Tenant's Work on or before the end of the Lease Term or sooner termination of the Lease (collectively the 'Guaranteed Obligations')". *See* Exhibit "A." (no emphasis added).

35.     2901 JMH has materially breached its obligations under the Lease by, *inter alia*, failing to pay rent, failing to complete the Tenant's Work and/or pay the costs to complete the Tenant's Work.

36.     Halpern has breached his duty of performance under the Guaranty by failing to guarantee 2901 JMH's duties and obligations under the Lease.

37.     Palm Court has been damaged as a direct and proximate result of Halpern's breach of the Guaranty.

38.     Pursuant to the Guaranty, Halpern is liable to Palm Court for such damages.

WHEREFORE, Plaintiff, prays that this Honorable Court enter judgment in its favor and against Defendant, JASON HALPERN for damages, interest, costs, and attorneys' fees, and such further relief as this Court deems just and proper.

Dated: September 22, 2016

Respectfully Submitted,

**LAW OFFICES OF CHRISTOPHER F. ZACARIAS, P.A.**
*Counsel for Plaintiff*
5757 Blue Lagoon Dr, Suite 230
Miami, Florida 33126
Telephone: 305-403-2000
Facsimile: 305-459-3964
E-Mail: czacarias@zacariaslaw.com

*/s/ Christopher F. Zacarias*
CHRISTOPHER F. ZACARIAS
Florida Bar No.: 85609



# EXHIBIT A

## AGREEMENT

**THIS AGREEMENT** (this "Agreement") made and entered into this ___ day of October 2015 (the "Effective Date") between Palm Court at 23rd Street, Ltd., a Florida limited partnership ("Landlord"), and 2901 JMH, LLC, a Delaware limited liability company ("Tenant"). All defined terms in this Agreement shall have the same meaning as set forth in the Lease.

1.　　**The Lease:** Landlord and Tenant are parties to that certain Lease, of even date herewith (the "Lease"), for space in the building known as "Palm Court" (the "Building), situated on that parcel of land (the "Land"), whose general address is 309 23rd Street, Miami Beach, Dade County, Florida. The Lease is attached hereto as Exhibit A.

2.　　**Leased Premises:** Pursuant to the Lease, the leased premises (the "Leased Premises") contains approximately 5,200 rentable square feet of space, known as Suite 100, which is subdivided into: (i) Area A (deemed to be 3,168 square feet of net rentable area), (ii) Area B (deemed to be 1,126 square feet of net rentable area), (iii) Area C (deemed to be 434 square feet of net rentable area), and (iv) Area D (deemed to be 472 square feet of net rentable area). The entire Leased Premises are identified in Exhibit "A" of the Lease. Area A is identified in Exhibit "A-1" of the Lease, Area B is identified in Exhibit "A-2" of the Lease. Area C is identified in Exhibit "A-3" of the Lease. Area D is identified in Exhibit "A-4" of the Lease.

3.　　**Contraction of Space.** Tenant shall, no later than ten (10) days following the earlier of (i) Tenant opening its business in the Leased Premises; or (ii) the date Tenant obtains a temporary certificate of occupancy in connection with Tenant's Work (the earlier of (i) or (ii) being the "Contraction Date") reduce the square footage of the Premises by 1,560 rentable square feet, known as all of Area B and Area C (the "Contraction Space"). On the Contraction Date, Tenant will quit and surrender the Contraction Space, vacant and broom clean and this Lease shall thereupon terminate as to the Contraction Space. Tenant shall surrender the Contraction Space in the condition as required in the Final Plans as previously approved by the Landlord under the Lease and all personally and moveable furniture, fixtures and equipment removed. From and after the surrender of the Contraction Space to Landlord, the term "Leased Premises" shall mean the Premises excluding the Contraction Space and the Leased Premises shall continue to be leased under all the applicable terms, covenants, and conditions of this Lease; provided, however, the Base Rent Schedule and Tenant's Proportionate Share (and all other terms conditioned on rentable square feet) shall not change as such amounts are set forth in the Lease (Landlord and Tenant hereby agreeing that the terms and conditions of the Lease already contemplate the return of the Contraction Space to Landlord). Notwithstanding the foregoing, during the Lease Term, Landlord and Tenant shall have the mutual right to use Area D; provided, however, (i) neither Landlord nor Tenant shall have any right to the exclusive use of any portion of Area D as such space is shared space; and (ii) Area D shall not be altered in any way, unless otherwise contemplated in the Final Plans. If Landlord, or any third party shall operate any business within the Contraction Space, then Landlord shall be solely responsible to pay to Tenant, within ten (10) days following receipt of an invoice from Tenant for Landlord's Proportionate Share of the Leased Premises (to wit: Area B, Area and half of Area D) for any and all utility charges and other pass through expenses associated with the Leased Premises. If Landlord fails to timely pay such amounts to Tenant, then Tenant shall have the right to offset such amounts against Rent until the same is reduced to $0.00. For purposes of this Agreement, "Landlord's Proportionate Share" shall be 35% (1,796rsf /5,200rsf).

**LANDLORD:**

**PALM COURT AT 23RD STREET, LTD., a Florida limited partnership:**

By: **PALM COURT INC. (its General Partner)**

By: _____

Ron Bloomberg, President

Date: ____11/2/15____

**TENANT:**

**2901 JMH, LLC, a Delaware limited liability company**

By: _____

Jason Halpern, Managing Member

Date: ____10/30/15____

#4580572 v4

# LEASE AGREEMENT

Between

## PALM COURT AT 23RD STREET, LTD.
a Florida limited partnership

### LANDLORD,

and

## 2901 JMH, LLC
a Delaware limited liability company

### TENANT

**LEASE AGREEMENT**

**THIS LEASE AGREEMENT** (this "<u>Lease</u>") made and entered into this ___ day of October, 2015 (the "<u>Effective Date</u>") between PALM COURT AT 23RD STREET, LTD., a Florida limited partnership ("<u>Landlord</u>"), and 2901 JMH, LLC, a Delaware limited liability company ("<u>Tenant</u>").

### 1.     BUILDING, LEASED PREMISES, LEASE TERM & OPTION

(a)     <u>The Building</u>. Subject to the terms and conditions set forth herein, Landlord hereby demises and lets unto Tenant, certain premises in the building known as "Palm Court" (the "<u>Building</u>"), situated on that parcel of land (the "<u>Land</u>"), whose general address is 309 23rd Street, Miami Beach, Dade County, Florida.

(b)     <u>Leased Premises.</u> The Leased Premises contains approximately 5,200 rentable square feet of space, known as Suite 100, which is subdivided into: (i) Area A (deemed to be approximately 3,168 square feet of net rentable area), (ii) Area B (deemed to be approximately 1,126 square feet of net rentable area), (iii) Area C (deemed to be approximately 434 square feet of net rentable area) and (iv) Area D (deemed to be approximately 472 square feet of net rentable area). The entire Leased Premises shall be identified and cross-hatched in <u>Exhibit "A"</u> and for purposes of this Lease shall be known as (the "<u>Premises</u>", "<u>Demised Premises</u>" or "<u>Leased Premises</u>"). Area A shall be identified in the cross-hatched area set forth in <u>Exhibit "A-1"</u>, Area B shall be identified in the cross-hatched area set forth in <u>Exhibit "A-2"</u>, Area C shall be identified in the cross-hatched area set forth in <u>Exhibit "A-3"</u>, and Area D shall be identified in the cross-hatched area set forth in <u>Exhibit "A-4"</u>.

(c)     <u>Lease Term.</u> Subject to and upon the terms and conditions set forth herein, this Lease shall continue in force for a term of twenty-four (24) months (the "<u>Lease Term</u>"), commencing on the Lease Commencement Date (defined below), and ending twenty-four (24) consecutive months thereafter (the "<u>Termination Date</u>"). For purposes of this Lease, the "<u>Lease Commencement Date</u>" shall be the date that Landlord, at Landlord's sole cost and expense, shall deliver the Premises to Tenant: (i) in compliance with all applicable building, zoning and land-use codes, regulations and laws as of the Effective Date; provided, however, Landlord shall not be liable to Tenant if the Premises is not in compliance with all applicable laws due solely to Tenant's Work (as defined below); (ii) in "broom-clean" condition with all exterior doors and windows to the Premises in good working order and condition; and (iii) otherwise ready for Tenant to commence Tenant's Work (collectively, the "<u>Delivery Conditions</u>"). Notwithstanding any provision of this Lease to the contrary: (i) in the event that Landlord has not delivered possession of the Premises to Tenant with all Delivery Conditions satisfied on or before January 2, 2016 (the "<u>Anticipated Delivery Date</u>"), then Tenant shall thereafter have the right, at Tenant's option, to: (x) be entitled to an abatement of all Rent equal to two (2) days of abatement for each day beyond the Anticipated Delivery Date that Landlord fails to deliver the Premises (with all Delivery Conditions satisfied), with such abatement of all Rent commencing on the Rent Commencement Date (defined below), or (y) terminate this Lease by written notice to Landlord, whereupon Tenant and Landlord shall be relieved of all further obligations under this Lease. Notwithstanding the provisions set forth herein to the contrary, Landlord shall have a five (5) day grace period (the "<u>Delivery Date Grace Period</u>") following the Anticipated Delivery Date where the Rent abatement shall be equal to one (1) day for each day Landlord fails to Deliver Premises, and during such Delivery Day Grace Period, Tenant shall not be permitted to terminate this Lease.

(d)     <u>Lease Year.</u> As used herein, the term "<u>Lease Year</u>" shall mean, for the first (1st) year, that period of time commencing with the Lease Commencement Date and ending twelve (12) calendar months thereafter, and thereafter, shall mean each successive twelve (12) month period.

(e)  <u>Rules and Regulations</u>. In addition to the terms set forth in this Lease, Tenant's use of the Premises shall be further subject at all times, to the "<u>Rules and Regulations</u>" set forth in <u>Exhibit "C"</u> to this Lease.

## 2.  RENT

(a)  <u>Rent-General Definition</u>.  Any and all monetary amounts owed by Tenant pursuant to the terms of this Lease shall be deemed "<u>Rent</u>", and shall include, but not be limited to, Base Rent, and Additional Rent (as defined herein below). Beginning on the Rent Commencement Date and on the first day of each and every month thereafter during the Lease Term, all Rent shall be paid by Tenant, monthly, in advance, together with all applicable state sales and/or use tax, in lawful money of the United States, to Landlord, at Landlord's principal office located at 309 23rd Street, # 300, Miami Beach, Florida, or at any other place designated in writing by Landlord from time to time. Except as otherwise set forth in this Lease, Tenant further warrants that it shall pay all Rent herein required, without deduction, diminution or setoff. Except as otherwise set forth in this Lease, Landlord's failure to provide a timely invoice or demand for any Base Rent, or Additional Rent, at all times during the term of the Lease, shall in no way be deemed a waiver of Landlord's rights to collect, and Tenant's obligation to pay such Rent. Any payment obligation of Tenant, including Base Rent or Additional Rent shall, for purposes of this Lease, be considered "<u>Rent</u>".

(b)  <u>Rent Commencement Date</u>.  The Rent Commencement Date shall be the Lease Commencement Date (the "<u>Rent Commencement Date</u>").

(c)  <u>Base Rent</u>.  Commencing on the Rent Commencement Date and continuing throughout the Lease Term, Base Rent shall be paid in the minimum monthly amounts set forth in <u>Exhibit "B"</u> attached hereto.

(d)  <u>Option</u>.  Tenant shall be granted an option to renew the Lease (the "<u>Renewal Option</u>") for an additional term of one (1) year (the "<u>Renewal Term</u>"). During the Renewal Term, all the terms and conditions of this Lease shall remain except that the Base Rent shall increase by 5% over the last Lease Year of the Lease Term. Tenant shall be conclusively deemed to have exercised its Renewal Option provided Tenant delivers written notice to Landlord of its election to renew at least 180 days prior to the Termination Date. All references in this Lease to Lease Term shall include the Renewal Term, if exercised by Tenant.

(e)  <u>Additional Rent - General Definition</u>.  "<u>Additional Rent</u>" shall mean (i) Tenant's Proportionate Share of the Building Operating Expenses (as further described in <u>Section 3</u> below); (ii) any extraordinary costs incurred by Landlord in connection with the operating, maintenance and security of the Building as a direct result of Tenant's use of the Leased Premises (as further described in <u>Section 3</u> below), (iii) any costs incurred in connection with the collecting of any portion of Rent, including Late Charges, Penalties and/or other costs incurred with collecting Rent (as each term is defined below); (iv) and all other sums which may be required to be paid by Tenant to Landlord from time to time during the Lease Term pursuant to the Lease (e.g. utility pass-through costs and parking charges) all of which shall be deemed Additional Rent and which shall otherwise be due from Tenant under this Lease. All Additional Rent shall be required to be paid within fifteen (15) days after Tenant's receipt of an invoice from Landlord, together with supporting documentation, to the extent applicable.

(f)  <u>Additional Rent – Building Operating Expenses / CAM</u>.  Tenant's obligations regarding Building Operating Expenses are as set forth in <u>Section 3</u> below.

2

(g)     Additional Rent – Sales and Use Tax.  Tenant agrees to pay to Landlord any sales or use tax or excise tax now or hereafter imposed or levied against any Rent or any other charge or payment hereafter required to be made by Tenant by any governmental agency having jurisdiction there over simultaneously with the payment of the Base Rent.

(h)     Late Fees and Penalties.  If Tenant shall fail to pay any installment of Rent when due, as adjusted, within five (5) calendar days of the date the same becomes due and payable, then Tenant shall pay to Landlord a late payment service charge (the "Late Charge") covering Landlord's administrative and overhead expenses of Five Hundred and 00/100 Dollars ($500.00) plus (ii) a penalty (the "Penalty") equal to $.05 for every dollar of Rent so overdue.  Any amount of Rent (including the Late Charge and Penalty) not paid to Landlord in accordance with the provisions set forth in this Lease shall bear interest at a rate of 12% per annum, and such interest shall also be deemed Rent.  The provisions set forth herein, for the payment of the Late Charges and Penalties, shall not be construed as an extension of the date which payments of any Rent is due by Tenant, nor are these provisions intended to relieve Tenant of its obligations to pay all such sums of Rent at the time or times herein stipulated.

## 3.     BUILDING OPERATING EXPENSES

(a)     Tenant's Proportionate Share and Payment.  For purposes of this Lease, "Tenant's Proportionate Share" shall mean 11.35% and Tenant's monthly payment of its Proportionate Share of Operating Expenses for the first Lease Year shall be $2,920.50 per month.

(b)     Operating Expenses – General.  For purposes of this Lease, the term "Operating Expenses" shall mean all reasonable costs incurred by Landlord for the operation and maintenance of the Land and Building (including all Building Common Areas (defined below) and any appurtenances, as determined by standard accounting practices consistently applied, and shall include all real estate taxes and assessments of the Building (the "Real Estate Taxes"), Landlord's insurance costs associated with the Building,  the costs incurred by Landlord for all contract services, fixed expenses, repairs and maintenance, materials and supplies, utility costs, reasonable general and administrative, costs of wages and salaries paid by Landlord to all persons engaged in the normal operation, maintenance and repair of the Land and Building and reasonable reserves for replacement.

(c)     Operating Expenses Net Only.  For purposes of this Lease, Operating Expenses shall be "net" only, and for that purpose, shall be deemed to be reduced by the amounts of any insurance reimbursement, other reimbursement, discounts, credits, reductions, allowances or other benefits received by Landlord in connection with any such Building Operating Expenses.

(d)     Operating Expense Exclusions.  Notwithstanding anything contained herein to the contrary, and without limiting the generality of the foregoing, the following items shall not be included in Building Operating Expenses;

(i)     Improvements of capital nature, or new construction additions or reconstruction of existing Building areas.  However, any costs that actually make the Building operate more efficiently (e.g. anything related to energy consumption reduction) or any Building Operating Expenses costs, or other costs required by institute of governmental regulations or by law, shall be excluded from this section;

(ii)     Utilities furnished directly to any Tenant and paid for directly by Tenant or another tenant of the Building, e.g. electricity to Tenant's Premises or other tenant's Premises; However, utilities utilized by Landlord for certain vacant premises within the building shall be excluded from this section until said vacant premises is leased;

3

(iii)    Vacant or occupied Building suite maintenance or repairs directly billed to and paid for by Tenant or any other tenant of the Building;

(iv)    Other tenant's personal property taxes;

(v)    Costs incurred by Landlord with respect to goods and services (including utilities sold and supplied to tenants and occupants of the Building) to the extent that Landlord is entitled to reimbursement for such costs other than through the Operating Expense pass-through provisions of such tenant leases;

(vi)    Costs incurred by Landlord for repairs, replacements and/or restoration to or of the Building or Common Areas to the extent that Landlord is reimbursed by insurance or condemnation proceeds, or by warrantors or other third persons;

(vii)    Costs, including cost of plans, construction, permit, license and inspection costs, incurred with respect to the installation of tenant improvements made for other tenants in the Building or incurred in renovating or otherwise improving, decorating, painting or redecorating vacant space for tenants or other occupants of the Building;

(viii)    Attorney's fees and other costs and expenses incurred in connection with the negotiations or disputes with present or prospective tenants or other occupants of the Building other than Tenant;

(ix)    Costs of a capital nature, including, without limitation, capital improvements, capital replacements, capital repairs, capital equipment and capital tools, all as determined in accordance with generally accepted accounting principles, consistently applied; However, any costs intended to make the building operate more efficiently (e.g. anything related to energy consumption reduction) or any Building Operating Expenses costs, or other costs required by institute of governmental regulations or by law, shall be excluded from this section;

(x)    Brokerage commissions, tenant incentives, finders' fees, entertainment and travel expenses and other costs incurred by Landlord in leasing or attempting to lease space in the Building;

(xi)    Interest on debt or amortization on any mortgage or mortgages encumbering the Building or Common Areas;

(xii)    Costs of installing the initial landscaping;

(xiii)    Repairs or replacements covered by warranties or guaranties;

(xiv)    Damage and repairs of a capital nature to the Common Areas attributable to condemnation, fire or other casualty, and damage and repairs of a non-capital nature to the Common Areas attributable to condemnation, fire or other casualty to the extent of awards or insurance proceeds received by Landlord;

(xv)    Damage and repairs necessitated by the negligence or willful misconduct of Landlord or Landlord's employees, contractors or agents;

(xvi)    Accountant's fees and other expenses associated with the enforcement of any leases or legal cost defenses of Landlord's title to, or interest in, the Building and Land;

4

(xvii)   Any expenses which would not be considered a normal Operating Expense for similar owner-managed office buildings located in the state of Florida;

(xviii)   Management Fees in excess of six (6) percent of gross revenues (inclusive of sales, use and/or excise taxes) for any given calendar year; and where Landlord reserves the right to include on its operating expense analysis, accrued management fees to the extent such management fees are charged, but where such management fee payments are actually withheld at the sole election of Landlord;

(xix)   There shall not be included in Building Operating Expenses any costs in excess of those that would be reasonably incurred by prudent owners, and their operators and managers, of similar office/commercial buildings;

Landlord shall not collect in excess of one hundred percent (100%) of all actual Building Operating Expenses.

(e)   Operating Expense Pass-Through and Payment Calculation.   During each calendar year of the Lease Term, commencing with the Rent Commencement Date, and together with Base Rent, Tenant shall pay as Additional Rent an amount equal to one-twelfth (1/12th) of Landlord's estimate of Tenant's Proportionate Share of Operating Expenses ("Tenant's Operating Expense Payment") for such calendar year together with all applicable sales tax.

(f)   Subsequent Year Operating Expense Payment Calculations.   Within thirty (30) calendar days of the end of the calendar year and each subsequent calendar year thereafter throughout the Lease Term, Landlord shall furnish a written statement (the "Landlord's Statement") setting forth Landlord's reasonable estimate of the forthcoming calendar year which shall reflect a new Tenant Operating Expense Payment (the "Revised Tenant Operating Expense Payment"). If however, Landlord shall furnish any such estimate for any calendar year subsequent to the commencement thereof, then (a) until the first day of the month following the month in which such estimate is furnished to Tenant, Tenant shall pay to Landlord on the first day of each month an amount equal to the monthly sum payable by Tenant to Landlord under this Paragraph in respect of the last month of the preceding calendar year; (b) promptly after such estimate is furnished to Tenant or together therewith, Landlord shall give notice to Tenant stating whether the installments of Tenant's Operating Expense Payments previously made for such Lease Year were greater or less than the installments of the Revised Tenant's Operating Expense Payment to be made for such calendar year in accordance with such estimate and (i) if there shall be a deficiency, Tenant shall pay the amount thereof within thirty (30) calendar days after written demand thereof, or (ii) if there shall have been an overpayment, Landlord, at Landlord's option, shall either refund to Tenant the amount thereof within thirty (30) days following the date of the Landlord's Statement or permit Tenant to credit the amount thereof against subsequent payments under this Paragraph; and (c) on the first day of the month following the month in which such estimate is furnished to Tenant, and monthly thereafter throughout the remainder of such Lease Year, Tenant shall pay to Landlord an amount equal to one twelfth (1/12th) of the Revised Tenant's Operating Expense Payment shown on such estimate. Landlord may at any time or from time to time furnish to Tenant a revised statement of Landlord's estimate of Tenant's Operating Expense Payment for such Lease Year based on reasonable projections, and in such case, Tenant's Operating Expense Payment for such Lease Year shall be adjusted and paid or refunded, as the case may be, substantially in the same manner as provided in the preceding sentence. This provision, and Tenant's obligations to make the appropriate payments to Landlord shall survive termination of this Lease. Notwithstanding the foregoing, in the event that Landlord fails to timely deliver the Landlord's Statement within 120 days of the end of the applicable calendar year, then

Landlord's right to seek reimbursement for any such reconciled amounts shall be waived and otherwise null and void.

(g) Proration of Operating Expenses. If the Rent Commencement Date or the Expiration Date shall occur on a date other than January 1, or December 31, respectively, any Additional Rent under this Paragraph 3 for the calendar year in which such Rent Commencement Date or Expiration Date shall occur shall be apportioned in that percentage which the number of calendar days in the period from the Rent Commencement Date to December 31 or from January 1 to the Expiration Date, as the case may be, both inclusive, shall be to the total number of calendar days in such Lease Year. In the event of a termination of this Lease, any Operating Expenses under this paragraph shall be paid or adjusted within thirty (30) calendar days after submission of a Landlord's Statement. In no event shall Base Rent ever be reduced by operation of this paragraph and the rights and obligations of Landlord and Tenant under the provisions of this paragraph with respect to any Operating Expenses shall survive the termination of this Lease.

(h) Objections to Landlord Statement. Each Landlord's Statement shall be conclusive and binding upon Tenant unless within thirty (30) calendar days after receipt of such Landlord's Statement, Tenant shall notify Landlord in writing, that it disputes the correctness of Landlord's Statement, specifying the particular respects in which Landlord's Statement is claimed to be incorrect. Landlord agrees to grant Tenant reasonable access to Landlord's books and records, including contracts for services and actual invoices or statements, for the purpose of verifying Operating Expenses incurred by Landlord during each respective Lease Year. Tenant shall only be able to review such information at the office of Landlord. Tenant shall not make any photo copies of any material without express written consent of Landlord (not to be unreasonably denied), Tenant further agrees in writing that any such information reviewed or copied from Landlord's books and records will be kept in strict confidentiality. If Tenant shall dispute the correctness of Landlord's Statement as aforesaid, and the parties shall not be able to resolve such dispute within thirty (30) calendar days after the giving of such Landlord's Statement, then the parties shall submit the dispute to a neutral certified public accountant experienced in the field of Real Estate or Property Management and agreed to by Landlord and Tenant (and if they cannot agree as to one such accountant, then each shall propose one such CPA) and the single or two CPA's thus designated, as the case may be, shall issue a report, by mutual agreement if two, and the decision of such accountant(s) shall be conclusive and binding upon the parties. The fees and expenses of said accountant(s) in determining such matter or matters shall be borne by the unsuccessful disputing party (and if both parties are partially unsuccessful, the accountant or accountants shall apportion the fees and disbursements between the parties based upon the degree of success of each party). Notwithstanding the foregoing, until such determination by such accountant(s) is made, Tenant shall pay its Proportionate Share of the Revised Operating Expenses Payment so furnished by Landlord, as Additional Rent, payable in accordance with this Paragraph 3. After such determination, the parties shall, if necessary, make the appropriate adjustments for any deficiency owed by Tenant or any overage paid by Tenant. If any audit of Landlord's books and records indicates that Landlord has made an error in Landlord's favor for more than three percent (3%) of the amount of Operating Expenses for any calendar year, Landlord shall reimburse Tenant for Tenant's reasonable costs of conducting the audit.

(i) Unexpected Operating Expense Increases. In the event the actual Operating Expenses during any month in any calendar year exceeds Landlord's projection for such month, and it becomes apparent to Landlord that Tenant's Operating Expense Payment will not pay Tenant's Proportionate Share of Operating Expenses for such calendar year, Landlord may give written notice to Tenant of any such expected deficiency and the justification therefor and in such notice may increase the monthly payments reasonably required to be made by Tenant to Landlord to the extent of such expected deficiency.

(j)     Controllable Operating Expenses.  Notwithstanding the foregoing, Controllable Operating Expenses (as hereinafter defined) shall not increase by more than five percent (5%) per annum. Sums above 5% shall not be included in Operating Expenses or passed-through to Tenant for payment. For purposes hereof, "Controllable Operating Expenses" shall mean and refer to all Operating Expenses other than Landlord's costs incurred for Real Estate Taxes, utilities, and insurance premiums.

(k)     Real Estate Taxes Maximum Discount.  Notwithstanding the foregoing, Landlord shall pay Real Estate Taxes so as to obtain all maximum allowable discounts, if any, and any amount of Real Estate Taxes for which Tenant is liable hereunder shall be based on the maximum allowable discount, if any, for payment of such Real Estate Taxes.

## 4.     ALL PAYMENTS DEEMED RENT

All monetary sums which Tenant is obligated to pay under the terms of this Lease, including all Additional Rent are deemed and considered to be Rent (as that term is also defined elsewhere herein), and in the event of non-payment thereof, Landlord shall have all of the rights and remedies provided for herein and by law, in the case of any non-payment thereof.

## 5.     USE

(a)     General.  Tenant shall use and occupy the Premises as a condominium sales and marketing office and general office use and for no other use unless otherwise approved by Landlord in writing.  Nothing contained in this Lease shall be construed to require Tenant to open nor continuously operate any business at the Premises.

(b)     Remedy for Improper Use.  In the event the Tenant uses the Premises for any purpose not expressly permitted without express written consent of the Landlord, Landlord, reserves the right to determine this Lease to be in Default (defined below) and to take immediate action to restrain said improper use by legal means, including injunction if necessary.

(c)     Miscellaneous Use Provisions.  Tenant shall not do or permit anything to be done in or about the Premises nor bring or keep anything therein which is not within the permitted use of the Premises and which will in any way increase the existing rate of or affect any fire or other insurance upon the Building or any of its contents, or cause a cancellation of any insurance policy covering the Building or any part thereof or any of its contents.  Tenant shall not do or permit anything to be done in or about the Premises which will in any way obstruct or interfere with the rights of other tenants or occupants of the Building or injure or annoy them or use or allow the Premises to be used for any, unlawful purposes; nor shall Tenant cause, maintain or permit any nuisance in or about the Premises.  Tenant shall not commit or allow to be committed any waste in or upon the Premises.  In the event Tenant's permitted use of the Premises increases the existing rate of or affects any fire or other insurance of Landlord, then and in that event Tenant agrees to pay said increase, retroactive to the date of such increase, within thirty (30) days following written demand by Landlord, together with all documentation evidencing the increase.

## 6.     UNUSUAL EQUIPMENT

Tenant will not install or maintain any electrically-operated equipment or any heavy equipment of any kind including without limitation vaults, or other heavy machinery, except machinery and equipment typically used within general office types of uses.  All other atypical or unusual installations will be prohibited until Tenant secures the Landlord's written consent, which will not be unreasonably withheld.

7

## 7.   OBLIGATIONS TO TAKE GOOD CARE OF BUILDING AND PREMISES

(a)   Tenant's Obligations.  Tenant shall at all times keep the interior of the Premises in a clean, safe and sanitary condition.  All damage caused by Tenant's negligence, or that of its agents, servants, employees or visitors, shall be repaired immediately by Tenant, at Tenant's sole cost and expense.  In the event Tenant fails, to the extent practicable, to commence repairs within five (5) calendar days after being given written notice by Landlord, Landlord shall have the option to enter the Premises and make all necessary repairs and maintenance at Tenant's sole cost and expense.  Any monies expended by Landlord shall be considered Additional Rent and shall be added to and be payable with the next monthly installment of Rent owed by Tenant.  Landlord shall not be responsible for any damage to Tenant's property, except if caused by Landlord, its agents, employees or contractor's negligence or willful misconduct.  Moreover, any damage to the Building or the Premises deemed a result of Tenant's failure to maintain the Premises, the appurtenances referenced above, (e.g. Tenant's leaving windows or doors open to the elements) shall be the sole responsibility of Tenant.  Moreover, Tenant shall at all times during the Lease Term abide by the Rules and Regulations set forth in Exhibit "C" hereof and attached hereto.  Any material failure on the part of Tenant to comply with the Rules and Regulations shall be deemed an Event of Default (after written notice and opportunity to cure) where Landlord's remedies are set forth in this Lease.

(b)   Landlord's Obligations.  Landlord, at Landlord's sole cost and expense, shall at all times maintain the Building and Common Areas in a safe, clean and sanitary condition.  Additionally, excluding items within the interior of the Premises installed or modified by Tenant, Landlord, at Landlord's sole cost and expense, shall be responsible for the maintenance, replacement or repair of the roof, slab, outer walls, underground utility and plumbing installations, underground electrical conduit and wire contained therein, and structural portions of the Building which shall be necessary to maintain the Building in good order, condition and repair.  In connection with the HVAC system servicing the Premises (the "Premises HVAC"), as of the Effective Date, Landlord represents that the Premises HVAC is in good operational condition.  At all times during the Lease Term, it shall be the responsibility of Tenant to maintain the Premises HVAC.  Tenant further agrees to use Landlord's designated HVAC maintenance company with the Premises HVAC being serviced quarterly, commencing approximately 90 days following the Commencement Date.  Any repair to the Premises HVAC in excess of $500.00 (an "HVAC Repair") shall be the responsibility of Landlord and such costs shall not be passed through to Tenant.   If Tenant notifies Landlord in writing of any water leaks, mold, electrical problems, malfunctioning lights of the Building Common Areas, broken or missing locks to the Building Common Areas, an HVAC Repair, or any other condition that in the reasonable determination of Tenant might pose a safety hazard to the Building or that Landlord has failed or is otherwise failing to meet its maintenance responsibilities, then Landlord shall, after receiving written notice from Tenant, cause such repairs to be remedied.  In the event Landlord fails to commence repairs within five (5) calendar days after being given written notice by Tenant and completes such repairs within thirty (30) days thereafter (to the extent such repairs can be completed in 30 days), then Tenant shall have the option to make all reasonably necessary repairs to the Premises, provide a statement to Landlord of the costs of such repairs and deduct the actual cost thereof from Rent until such amount is reduced to $0.00.  Notwithstanding the foregoing, verbal or other reasonable notice shall be deemed acceptable in the event of an emergency or a life or public safety emergency before Tenant may exercise its rights hereunder.

## 8.   COMPLIANCE WITH DIRECTIVES OF AUTHORITIES

Tenant shall promptly execute and comply with all statutes, ordinances, rules, orders, regulations and requirements of the federal, state, county, and municipal governments and any of their departments and agencies with jurisdiction over the Premises, and for the correction, prevention and abatement of nuisances or other grievances in, upon or connected with the Premises or Tenant's operation therein

8

during the term of this Lease. Tenant shall if necessary, promptly comply with and execute any rules, orders and regulations of the Southeastern Underwriters Association for the prevention of fires, all at Tenant's own cost and expense. If by reason of any failure of Tenant to comply with the provisions of this paragraph, the rate of fire insurance with extended coverage on the Building or equipment or other property of Landlord which Landlord may have, but which Landlord is not required to have, shall be higher than it otherwise would be, Tenant shall reimburse Landlord, on written demand, for that part of the premiums for fire insurance and extended coverage paid by Landlord because of such failure on the part of Tenant. Notwithstanding the foregoing, Landlord shall be responsible for any compliance with any laws existing as of the Effective Date, including compliance with the Americans With Disabilities Act of 1990, as amended, and, in addition, in the event any rules, orders and regulations shall either (a) require the removal of asbestos or other toxic or hazardous wastes or materials not placed in Tenant's Premises by Tenant, or (b) structural changes, including but not limited to, the erection of fire escapes or exits, or (c) require non-structural changes which would have been required irrespective of the nature of the Tenant's tenancy, then and in any such event, the same shall be complied with by Landlord at its sole cost and expense, but only to the extent the aforesaid impairs Tenant's use of the Premises.

## 9. ALTERATIONS AND IMPROVEMENTS

(a) <u>Alterations and Improvements by Tenant</u>. Following Tenant's completion of the Tenant's Work, Tenant shall not disfigure or deface any part of the Premises or Building, nor obstruct or permit any obstruction, alteration, addition, improvement, decoration, sign or other installation in or on the Building (collectively, the "<u>Alterations</u>") without the prior written consent of the Landlord, which consent shall not be unreasonably withheld, conditioned or delayed and shall be provided within five (5) calendar days of Tenant's written request to Landlord for such approval. Furthermore, to the extent applicable, Tenant shall supply all pertinent information, including all architectural plans, design plans (including all layout and location of furniture, fixtures and equipment ("<u>F, F & E</u>") and engineering plans (collectively the "<u>Alteration Plans</u>"), that may be required in order for Landlord to best evaluate Tenant's request for the Alterations so that Landlord may make an informed decision to either approve or disapprove Tenant's request for the subject Alterations. Landlord's five (5) days for giving or withholding consent shall commence with the complete set of Alteration Plans being delivered to Landlord; provided, however, if such Alterations are cosmetic in nature (i.e., paint and carpet) or otherwise shall not require a building permit, then Tenant shall not need to deliver the Alteration Plans to Landlord. If Landlord shall fail to timely respond to Tenant request for consent to any Alterations, Landlord shall be deemed to have consented to Tenant's Alterations.

(b) <u>Alterations and Improvement to Become Part of Premises</u>. All Alterations, including, but not limited to, partitions, flooring, air-conditioning ducts, hood and exhaust systems, grease traps or equipment (except movable furniture and fixtures installed at the expense of Tenant and removable without defacing or injuring the Building or the Premises) shall become the property of Landlord at the termination of this Lease should Landlord so elect. Landlord, however, reserves the option to require Tenant, upon demand in writing at the time Landlord approves the Alterations to remove such Alterations (including those not removable without defacing or injuring the Premises whereupon it shall be the obligation of Tenant to repair same) and to restore the Premises and the Building to a condition reasonably acceptable to Landlord, reasonable wear and tear excepted, upon the termination of the Lease (either through natural termination or through Default); provided, however, Landlord shall not have the right to require Tenant to remove Tenant's Work, as further set forth below. Tenant agrees to restore the Premises immediately upon the receipt of the said demand in writing at its own cost and expense and agrees in case of its failure to do so, that Landlord may do so and collect the cost thereof from Tenant upon written demand, or, deduct said costs from the Security Deposit (as defined below). Tenant will, at Tenant's own expense, keep the Leased Premises in good repair and tenantable condition

9



during the Lease Term and will replace at its own expense any and all broken doors or glass caused by Tenant in and about the Premises.

(c)     Condition of the Premises.  The Leased Premises shall be delivered to Tenant in its "AS IS" condition.  The foregoing reference to the Premises being in "AS IS" condition shall not relieve Landlord of any maintenance, repair or replacement obligations with respect to the Premises and the Building and related improvements otherwise specifically set forth in this Lease as the responsibility of Landlord, nor shall Landlord be relieved from its obligations to satisfy or correct any defective Delivery Conditions.

## 10.     INSPECTION, EXAMINATION AND ENTRY

Landlord and Landlord's agents shall have the right to enter the Premises at all reasonable hours to examine the same provided Landlord furnishes Tenant 24 hours advanced written notice, which may be delivered by email or facsimile.  In addition, Landlord or its agents and workmen may enter the Premises at anytime in the event of emergency to make such repairs, alterations or improvements in the Building as Landlord may deem necessary or desirable.  If Tenant shall not be personally present to open and permit entry into the Premises and where Tenant does not provide Landlord a key to the Premises (or the key initially required under the Lease and provided by Tenant to Landlord does not operate the locks to the Premises due to Tenant's alteration of such locks) when entry thereto shall be necessary in the event of an emergency, Landlord may forcibly enter same without rendering Landlord liable to any claim for damages and without affecting the obligation and covenants of the Lease.  These points notwithstanding, employees of Landlord and Landlord's agents shall not be permitted to enter the Premises by passkey except in case of emergency.  At all times, Landlord shall use reasonable efforts not to interfere with Tenant's business operations.

## 11.     NO LIABILITY

Tenant will not hold Landlord liable for any latent defect in the Premises or in the Building, provided however that Landlord shall be responsible for commencing the correction of all latent defects within twenty (20) calendar days of written notice from Tenant of such latent defect and Landlord's confirmation that such latent defect does in fact exist.  Except due to Landlord's gross negligence or willful misconduct, Landlord shall not be liable for any failure of water supply, electric current, communication service, heating or air conditioning, or any other service; nor for injury or damage to persons or property caused by fire or theft or by the elements or by other tenants or persons in the Building, or resulting from the operation of elevators, heating or air conditioning or lighting apparatus, or from falling plaster, or from steam, gas, electricity, water, rain or dampness, which may leak or flow from any part of the Building or from the pipes, appliances, or plumbing work of the same, or from any other place or for damages resulting from the acts or omissions of Tenant, Tenant's agents, employees, invitees or other occupants of the Building.  Nor shall Landlord be liable for any loss or damage that Tenant may sustain by reason of the closing or darkening of any of the windows in the Premises through the erection of or any addition to a new building or otherwise, and the same shall not constitute a constructive eviction.  All goods or property or personal effects stored or placed by the Tenant in or about the Building shall be at the sole risk of the Tenant.

## 12.     DAMAGE BY FIRE OR OTHER CASUALTY

If through no fault or negligence of Tenant, its visitors, agents or servants, the Premises shall be partially damaged by fire or other casualty, the damage shall be repaired by Landlord's insurance proceeds.  Until such repairs are made all Rent shall be commensurately reduced by that percentage of Premises deemed unusable.  Landlord's restoration obligation shall be limited to the returning of the

10

Premises to substantially the same condition as was required for delivery of the Premises upon the Lease Commencement Date. Landlord shall only be obligated to restore the Landlord's Work (if any) to the extent of insurance proceeds available, and Tenant shall be responsible for all costs of improvements to the Premises above and beyond those supplied by Landlord at Landlord's expense (if any) as part of the initial construction and equipping of the Premises, including without limitation the "Tenant's Work" which was not paid for by Landlord. If the damage shall be so extensive as to render the Premises wholly untenantable, the Rent shall cease until such time as the Premises shall become tenantable. However, if the damage is so extensive that the Premises cannot be made tenantable within nine (9) months from the date of the fire or other casualty, either party shall have the right to terminate this Lease upon ten (10) calendar days written notice to the other. In case the Building generally throughout (though the Premises may not be affected) is so injured or destroyed by fire or other casualty that Landlord shall decide not to rebuild or reconstruct the Building, the term of this Lease shall cease upon ten (10) calendar days' written notice sent by Landlord and the Rent shall be paid up to the time of such destruction or the date Tenant surrenders possession of the Premises, whichever is later, and the Lease shall thereafter be of no further effect. In the event that any questions shall arise between Landlord and Tenant as to whether or not repairs shall have been made with reasonable dispatch, due allowance shall be made for any delays which may arise in connection with the adjustment of the fire insurance loss and for any delays arising out of what are commonly known as "labor troubles" or "material troubles" or from any other cause beyond Landlord's control. In any event Landlord shall not be liable to Tenant by reason of fire or other damage to the Building or the Premises unless specifically caused by Landlord or Landlord's agent's gross negligence. Notwithstanding anything contained herein to the contrary, Tenant shall at its own expense, provide insurance coverage for all plate glass and glass doors appurtenant to the Premises. In the event that an uninsurable event materially interferes with Tenant's business carried on at the Premises and for which uninsurable event no provision is otherwise made hereunder, Landlord and Tenant agree that the in lieu of all Rent owing to Landlord hereunder, for the duration of such business interruption, Tenant shall pay to Landlord as sole and exclusive compensation for the Premises fifty percent (50%) of the Base Rent then owing. The foregoing notwithstanding, in the event that the Premises have not been restored to tenantable condition and delivered to Tenant within 150 days of the date of such damage or destruction, then Tenant, by way of written notice to Landlord, shall be entitled to terminate this Lease.

### 13.    CONDEMNATION

In the event all of the Leased Premises is acquired by a public or quasi-public entity (hereinafter referred to as "Condemning Authority") through the use of power of eminent domain or through a sale in lieu thereof (hereinafter referred to collectively as "taken" or "taking"), then, in that event, it is understood that this lease as shall be terminated upon the date title to the area taken vests in the condemning authority. The tenant hereby waives and forfeits any and all claims in the nature of apportionment of the compensation paid for the property taken (including, but not limited to, value of Land, Building, site improvements, fixtures, trade fixtures,) and/or damages to the property remaining (including, but not limited to, value of and/or damage to Land, Building, site improvements, fixtures, trade fixtures, value of any unexpired leasehold interest, costs of a cure). Tenant reserves solely its claims against the condemning authority for its own business damages and its own relocation costs, and only to the extent that any such claims do not interfere with any of the aforesaid rights reserved by Landlord, Landlord's claims, Landlord's defenses to any taking or Landlord's ability to settle with a condemning authority. Any determination as to whether there is any interference with any of Landlord's claims or positions shall be made in landlord's sole discretion. In the event of a partial taking, Landlord shall have the right, in its sole discretion (and without regard to the quantity or quality of the taking), to terminate this lease as to the remainder property upon ninety (90) days written notice to tenant. Tenant hereby waives all objections to landlord's withdrawal of any funds paid/or deposited by any condemning authority. Tenant shall make no objection to the taking or the extent of the taking without the express authorization of the landlord, granted or with-held in the landlord's sole discretion. Tenant agrees to

11



assist and otherwise cooperate with Landlord's position with respect to consenting to or contesting the taking, extent of the taking in quantity and quality, surrender of possession, withdrawal and disbursal of funds deposited, apportionment of funds, damages resulting from the taking. In the event that landlord decides to sell all or part of the leased premises in lieu of condemnation, tenant agrees to execute and deliver to Landlord whatever subordination, quit-claim deed or other documents are required by the condemning authority in order to close the purchase transaction. Tenant agrees to provide Landlord with copies of documents requested by the Landlord which would be helpful to the Landlord in the eminent domain matter. Tenant agrees to give copies of any documents made available to the condemning authority to the landlord.

## 14.    INTENTIONALLY OMITTED

## 15.    SERVICES PROVIDED BY LANDLORD

Landlord shall provide to Tenant the following services (unless otherwise noted below) whose costs shall be included in Operating Expenses.

(a)    Cleaning.  Landlord will provide cleaning only to the Building Common Areas. Such cleaning services for Tenant's Premises shall be conducted at the sole cost and expense of Tenant. If Tenant elects to hire the services of a third party cleaning/janitorial company, Tenant shall first be required to have such third party cleaning company approved by the Landlord, where such approval may be withheld in the reasonable discretion of Landlord.  Notwithstanding Landlord's approval of such cleaning company, Landlord shall reserve the right to terminate such cleaning company, for good cause, within thirty (30) calendar days written notice to Tenant. Tenant agrees to comply with all applicable laws and the Rules and Regulations regarding the disposal of all food and other wastes and to provide comparable cleaning service and extermination services for Tenant's Leased Premises.

(b)    Tenant's Utilities, Lighting & Electric.  Tenant shall be provided one or more electric meters to Premises. Landlord reserves the right to seek reimbursements for any meter deposits or other domestic, sanitary or water meters which may have previously been incurred and/or paid for by Landlord a specific list of which shall be provided Tenant upon execution hereof.  Otherwise, Tenant shall be responsible for its own electrical service.

(c)    Building Electric.  Routine maintenance and electric lighting service for all Common Areas of the Building (including exterior lighting) in the manner and to the extent deemed by Landlord to be standard.  Building common area electricity and electrical facilities to furnish electrical current for normal office building use.  No electric current shall be used except that furnished or approved by the Landlord,

(d)    Access.  Tenant shall be permitted twenty-four (24) hour access to its Premises.

(e)    Trash Room.  Landlord shall provide to Tenant access to the Building's trash room (the "Trash Room").  It is expressly understood and agreed that such Trash Room shall be shared between Tenant, Landlord and other tenants of the Building.  In this regard, Tenant shall initially have the right to utilize a portion of the Trash Room for Tenant's exclusive use by Tenant's arranging with the Building's service provider, a dumpster sized according to Tenant's requirements, and for Tenant's exclusive use; provided however, that Tenant shall not place a dumpster in the Trash Room which will prevent Landlord from placing, at a minimum, a two yard trash container within the Trash Room to be exclusively used by Landlord for the remaining portion of the Building.  Landlord shall at all times reserve the right to alter the terms and conditions of use surrounding the Trash Room and its usage and sharing arrangements between the Building and all tenants of the Building provided such alteration shall

not unreasonably interfere with Tenant's disposal of its trash. Additional terms and conditions for the use of the Trash Room, as well as, methods of depositing trash and scheduling of trash pick, shall be more specifically defined in the Rules and Regulations section of the Lease. Landlord shall not alter the terms and conditions such that they place commercially unreasonable burdens or limitations on Tenant's access to or use of the Trash Room when considered in light of Tenant's use of the Premises.

(f)    Cable and Electric-Miscellaneous. No cable or wire shall be brought into the Premises, except upon the written consent and approval of the Landlord, which may not be unreasonably withheld, delayed or conditioned. Tenant shall use only machinery and equipment that operates on the Building's standard electric circuits or equipment (the installation of which shall be at Tenant's expense after approval in writing by the Landlord) shall be paid for by the Tenant based upon the actual cost thereof directly to Florida Power and Light.

(g)    Water. Landlord shall provide water suitable for normal office use of the Premises.

(h)    Miscellaneous. Such services and such other services as Landlord in its sole discretion may elect to provide, shall be provided as long as the Tenant is not in Default under any of the terms, provisions, covenants and conditions of this Lease, subject to interruption caused by repairs, renewals, improvements, changes of service, alterations, strikes, lockouts, labor controversies, inability to obtain fuel or power, accidents, breakdowns, catastrophes, national or local emergencies, acts of God and conditions and causes beyond the control of Landlord and upon such happening, no claim for damages or abatement of Rent for failure to furnish any such services shall be made by the Tenant or allowed by the Landlord.

(i)    Interruption of Services. If any of the services described above or elsewhere in this Lease are interrupted as a result of an act of Landlord, its contractors, agents or employees, then Landlord shall use reasonable diligence to promptly restore such service. Neither the interruption or cessation of such services nor the failure of Landlord to restore the services shall render Landlord liable in any respect for damages to person or property; provided, however, if such interruption of services is caused by Landlord or Landlord fails to use reasonable diligence to restore, and such services are not restored within one (1) day after the interruption or cessation of such services, then Rent shall be abated until such services are restored. Additionally, if such services are not restored within thirty (30) days after the interruption or cessation of such services (events of force majeure excluded), then Tenant shall have the right to terminate this Lease at any time thereafter by providing written notice thereof to Landlord, and neither party shall have any further liability hereunder.

## 16.    INTENTIONALLY OMITTED

## 17.    DEFAULT AND REMEDIES

(a)    General. All rights and remedies of the Landlord herein enumerated shall be cumulative, and none shall exclude another or any other right or remedy provided by law. In the event of a Default invoked by Tenant, Tenant agrees it shall look solely to the interest of Landlord or its successor (as Landlord hereunder) in the real property of which the Leased Premises are a part for the satisfaction of any judgment or judicial process requiring the payment of money as a result of any negligence or breach of this Lease by Landlord or such successor, and no other assets of Landlord or its successor shall be subject to levy, execution or other enforcement procedure for the satisfaction of Tenant's remedies in any of such events. Tenant's sole right and remedy in any action or proceeding concerning Landlord's reasonableness (where the same is required under this Lease) shall be an action for declaratory judgment and/or specific performance. In connection with Tenant, and in additional to other provisions that might

13

otherwise address a Tenant Default under this Lease, all of the following shall also be deemed "Default" or an "Event of Default":

(i)     Bankruptcy.  If Tenant or any guarantor of this Lease shall become bankrupt or insolvent or unable to pay its debts as such become due, or file any debtor proceedings or if Tenant or any guarantor shall take or have taken against either party in any court pursuant to any statute either of the United States or of any State, a petition in bankruptcy or insolvency which has not been dismissed within one hundred twenty (120) calendar days or for reorganization or for the appointment of a receiver or trustee of all or any portion of Tenant's or any such guarantor's property, or if Tenant or any such guarantor makes an assignment for the benefit of creditors, or petitions for or enters into an arrangement with its creditors, then this Lease shall terminate and Landlord, in addition to any other rights or remedies it may have, shall have the immediate right of reentry and may remove all persons and property from the Premises and such property may be removed and stored in a public warehouse or elsewhere at the cost of and for the account of Tenant all without service of notice or resort to legal process and without being deemed guilty of trespass, or becoming liable for any loss or damage which may be occasioned thereby.

(ii)    Payment of Rent or Any Other Obligation Under the Lease.  If the Tenant fails to (i) make a payment of any Rent within five (5) days of the first day of each month (with the exception of the first month of the Lease Term), or (ii) promptly and fully perform any of the provisions of this Lease, within the specific time frames prescribed in the Lease, or, where time frames are not specifically referenced, within thirty (30) days following written notice from Landlord or (iii) if the leasehold interest or the Tenant's business or fixtures of Tenant are levied upon under execution or attached by process of law, or (iv) if the Tenant makes an assignment for the benefit of creditors, or (v) if Tenant files any petition in Bankruptcy or (vi) if any receiver (Landlord or otherwise) is appointed for any property of the Tenant, then Landlord at its option and subject to Tenant's right to cure, may forthwith terminate this Lease and the Tenant's right to possession of the Premises, or, terminate only Tenant's right to possession hereunder. If the nature of any remedial action required of Tenant is such that it cannot be reasonably completed within such thirty (30) day cure period, then Tenant shall have demonstrated to Landlord that it has commenced to cure said Default, and Tenant shall thereafter have a reasonable period of time to complete such cure. No extension of time whatsoever shall be granted by Landlord in connection with Tenant's obligation to make any payment deemed Rent.

(b)     Termination of Lease.  Upon any termination of this Lease, whether by lapse of time or otherwise, Tenant shall surrender possession and vacate the Premises immediately, and deliver possession thereof to the Landlord, and Tenant hereby grants to the Landlord full and free license to enter into and upon the Premises in such event and to expel or remove the Tenant and any others who may be occupying or within the Premises and to remove any and all property therefrom, using such force as may be allowed by law without being deemed in any manner guilty of trespass, eviction or forcible entry or detainer, and without relinquishing the Landlord's rights to Rent or another right given to Landlord hereunder or by operation of law.

(c)     Storing of Tenant's Property.  Any and all property which may be removed from the Premises by Landlord pursuant to the authority of this Lease, to which Tenant is entitled, may be handled, removed or stored by Landlord at the risk, cost and expense of Tenant, and Landlord shall in no event be responsible for the value, preservation or safekeeping thereof. Tenant shall pay to Landlord, upon demand, all expenses incurred in such removal and all storage charges against such property so long as the same shall be in the Landlord's possession or under Landlord's control. Landlord may place such property in storage for the account of, and at the expense of Tenant and if Tenant fails to pay the cost of

14



storing such property after it has been stored for a period of ninety (90) calendar days or more, Landlord may sell any or all of such property in such manner and at such times and places as Landlord, in its sole discretion, may deem proper, without notice to or demand upon Tenant for the payment of any part of such charges of the removal of any of such property and shall apply the proceeds of such sale first to the cost of expenses of such sale, including reasonable attorneys' fees; second, to the payment of the costs and charges of storing any property; third, to the payment of any other sums of money which may then or thereafter be due to Landlord from Tenant under any of the terms hereof; and fourth, the balance, if any, to Tenant, the removal and storage of Tenant's property as above provided shall not constitute a waiver of Landlord's lien thereon.

(d)     Acceleration of Rent. Landlord shall at all times reserve the right to accelerate all Rent owed by Tenant for the entire remaining Lease Term in the event of a Default of the Lease, provided Landlord has an appropriate court order. Such Rent acceleration shall be exclusive of any security retained by Landlord as a result of any Tenant Default.

(e)     Landlord's Option to Cure Default and Charge Tenant. If Tenant shall fail to observe or perform any term or condition on Tenant's part to be observed or performed under this Lease, then Landlord may, after providing the notice required herein, perform the same for the account of Tenant, and if Landlord shall make any expenditure or incur any obligation for the payment of money in connection therewith (including reasonable attorneys' fees in instituting, prosecuting and/of defending any action or proceeding through appeal), the sums paid or obligations incurred, with interest at 18% per annum, and all other costs shall, for purposes of this section shall be deemed Additional Rent, and shall be required to be paid by Tenant to Landlord immediately after rendition of a bill or statement thereof has been furnished by Landlord to Tenant.

(f)     Consequential Damages. Notwithstanding any provision of this Lease to the contrary, Tenant shall not be liable to Landlord for any special, indirect, consequential or punitive damages or lost profits arising out of or in any way connected with this Lease or an account of default or breach hereunder, and Landlord hereby waives any right to seek consequential or punitive damages against Tenant.

(g)     Defaults Final. With the exception of the payment of Rent, no Event of Default shall be deemed conclusive or final until Landlord has provided to Tenant the Default Notice giving rise to Landlord's declaration of such Default and, such Defaults are not cured by Tenant within the cure periods set forth herein.

(h)     Landlord Lien. Landlord will have such lien rights as are provided under Florida law, provided, however, that such lien rights shall be subject and subordinate to the lien or encumbrance of Tenant's equipment or furnishings financier or lessor.

(i)     Landlord Default. A "Landlord Default" shall be deemed to exist if Landlord fails to perform, comply with or observe any obligation or undertaking of Landlord to Tenant in this Lease, and such failure continues for a period of thirty (30) days after Landlord receives written notice from Tenant specifying the failure, unless such failure cannot reasonably be cured within such thirty (30) day period, in which event Landlord must commence curing such failure within such thirty (30) day period and diligently pursue the same to completion to avoid a Landlord Default hereunder.

(i)     Remedies of Tenant. Upon any Landlord Default not timely cured by Landlord where proper notice was given, Tenant may, at Tenant's option, in addition to all other rights, remedies and recourses afforded Tenant at law or in equity, do any one or more of the following:

15



(x)     Terminate this Lease by delivering written notice thereof to Landlord in which event Landlord shall remain liable for all damages resulting from such Landlord Default; provided, however, Landlord shall not be liable to Tenant for any special, indirect, consequential or punitive damages or lost profits arising out of or in any way connected with this Lease or an account of Landlord Default, and Tenant hereby waives any right to seek consequential or punitive damages against Landlord.

(y)     Pay or perform the underlying obligation for the account of Landlord where Landlord shall reimburse Tenant upon demand for all reasonable expenses incurred by Tenant performing the underlying obligation for the account of Landlord.   If Landlord fails to reimburse Tenant upon demand for such damages and expenses, Tenant may offset the Rent due to Landlord by the amounts owing by Landlord.

## 18.   ASSIGNMENT OR SUB-LETTING OF TENANT'S INTEREST

Tenant shall not sell, transfer, mortgage, or assign the Tenant's interest in this Lease or any security deposited thereunder, nor shall Tenant sublet or assign the Premises, or any part thereof, without the prior written consent of Landlord which consent shall not to be unreasonably withheld, conditioned or delayed.

## 19.   COLLECTION OF RENT FROM OTHERS

If Tenant's interest in this Lease is assigned, or if the Premises is sublet, Landlord may, after Default by Tenant, collect Rent from the assignee or sub-tenant and apply the net amount collected to the Rent due from Tenant.  No such collection shall be deemed a waiver of the covenant herein against sale, transfer, mortgage, assignment and subletting or a release of Tenant from the performance of the covenants herein contained.  In the event of such Default, Tenant hereby assigns the rent due from the sub-tenant or assignee to Landlord, and hereby authorizes such sub-tenant or assignee to pay the rent directly to Landlord.

## 20.   INTENTIONALLY OMITTED

## 21.   EXAMINATION OF PREMISES AND NO ORAL REPRESENTATION

(a)     Acceptance of Premises.  By executing this Lease, Tenant shall be deemed to have accepted the Premises in its AS-IS condition, subject to the terms of this Lease.  This Lease does not grant Tenant any right of air and light over and about the Premises, Land or Building and Landlord reserves the right to modify, augment or reduce the size of the Building in its reasonable discretion provided such augmentation or reduction does not unreasonably interfere with Tenant's business.  No representation, except those contained herein, has been made on the part of the Landlord with respect to the condition of the Premises or the Building.  Tenant will make no claim on account of any representation whatsoever, whether made by any renting agent, broker, offices or other representative of Landlord or which may be contained in any circular, prospectus advertisement relating to the Premises, or otherwise, unless the same is specifically set forth in this Lease.

(b)     Obligation of Tenant Concerning Modification of Premises.  Tenant acknowledges that the entire Premises (Areas A, B, C and D) is being delivered fully operational for the Permitted Use, including all electrical, mechanical, plumbing and life safety systems (the "Premises Systems").  As part of Tenant's Work, Tenant (i) may modify the Premises Systems; (ii) shall ensure that entire Premises has the use of the Premises Systems; (iii) agrees that Tenant shall not alter Area B or Area C (except for any repairs that may be required as a result of distribution of the Premises Systems in Area

16

B and Area C as may be required or as otherwise modified pursuant to the Final Plans (defined below)); (iv) shall ensure that each Area within the Premises shall have its own light switch(s) in those locations set forth on the Space Plan (defined below) or as otherwise modified pursuant to the Final Plans; provided, however, the electric panel (the "Electric Panel") for the Premises shall remain located in Area D or as otherwise set forth on the Final Plans and at all times will be accessible by Tenant, and further provided that the Electrical Panel shall contain a lock whose keys shall be controlled by Tenant and Landlord and (v) shall ensure that at least one thermostat for the Premises HVAC system will be located in Area A and controlled by Tenant or as otherwise modified pursuant to the Final Plans and in the event Area B or C is leased to a third party, then Tenant shall use commercially reasonable efforts to unsure that the temperature in Area B and Area C is reasonably comfortable for such tenants use thereof. Landlord and Tenant each acknowledge and agree that Areas A, B, C and D shall not be separately metered for electric service and in the event Area B or C is leased to a party other than Tenant, then such occupant shall pay its pro rata share of electric costs and expenses directly to Tenant within thirty (30) days following an invoice for the same. Landlord shall incorporate the foregoing provision in any agreement with a third party for Area B or Area C.

## 22.   SUBORDINATION

Tenant agrees that its rights hereunder are subordinate to the lien of any mortgage, ground lease, or any other method of financing or refinancing now or hereafter placed against the Land and/or the Premises and/or any/or all of the Building now built or hereafter to be built on the Land by Landlord and to any and all advances made or to be made thereunder and to the interest thereon and to all renewals, replacements, modifications, consolidations and extension thereof. Tenant further agrees that it will enter into and execute all documents which any such mortgagee or any ground lessor may reasonably request Tenant to enter into and execute, including a subordination agreement. Tenant agrees that it will send copies of all notices to Landlord, to Landlord's mortgagees or ground Lessors, provided that Tenant has been furnished with the name and address of such mortgagees or ground Lessors, and further provided that Landlord or Landlord's mortgagee or ground lessor has requested Tenant to send copies of such notices. Tenant agrees that Tenant will attorn to any mortgagee or ground lessor or purchaser at a foreclosure sale, if requested to do so.

Tenant further covenants and agrees that if by reason of a default under any underlying lease (including an underlying lease through which the Landlord derives its leasehold estate in the demised premises), such underlying lease and the leasehold estate of the Landlord in the premises demised hereby is terminated, Tenant will attorn to the then holder of the reversionary interest in the premises demised by this Lease and will recognize such holder as the Tenant's Landlord under this Lease. Tenant agrees to execute and deliver, at any time and from time to time, upon the request of the Landlord or of the lessor under any such underlying lease any instrument which may be necessary or appropriate to evidence such attornment. Tenant further waives the provision of any statute or rule of law now or hereafter in effect which may give or purport to give the Tenant any right of election to terminate this Lease or to surrender possession of the premises demised hereby in the event any proceeding is brought by the lessor under any underlying lease to terminate the same. Failure of Tenant to comply with such reasonable requests by Landlord shall be deemed an Event of Default.

If a mortgagee of Landlord's shall request reasonable modifications to this Lease, Tenant shall execute, acknowledge, and deliver to the mortgagee an agreement, in form and substance satisfactory to the mortgagee, evidencing such modifications, provided that such modifications do not increase Tenant's obligations under this Lease or affect the leasehold interest created by this Lease, or tenant's use and occupancy of the Leased Premises. Within thirty (30) days following the Effective Date, Landlord shall use its best efforts to obtain a commercially reasonable subordination, non-disturbance and attornment

17

agreement from Landlord's existing lender (the "Existing Lender"), which shall be executed by Landlord, Tenant and Existing Lender.

### 23. HOLDING OVER

If the Tenant retains possession of the Premises or any part thereof after the termination of this Lease or any extension thereof, by lapse of time or otherwise, the Tenant shall pay the Landlord Rent at 175% the rate payable for the year preceding the lease termination, computed on a per month basis, for the time the Tenant thus remains in possession. The provisions of this paragraph do not waive the Landlord's rights of re-entry or any other right hereunder. Any retention of the Premises after the termination of this Lease or any extension thereof shall be considered as a month-to-month holdover unless otherwise agreed to in writing by both parties. With respect to Tenant's improvements to the Premises, whether installed as part of the Tenant's Work or by subsequent Alteration, approved or deemed approved by Landlord, Landlord shall at the time of approving the subject Alteration, advise Tenant whether Landlord shall require the removal of the subject Alteration at the end of the Lease Term. Only those Alterations so indicated by Landlord as being required for removal shall be removed at the end of the Term of the Lease. Otherwise, Tenant shall not be required to remove any other Alterations or fixtures and shall surrender the Premises without having to restore same to the same condition as it existed on the date hereof. Notwithstanding the foregoing, Tenant shall have no obligation to remove any of Tenant' Work; provided, however, Tenant shall have the right to remove Tenant's personal property and moveable trade fixtures and equipment, provided that Tenant repairs any damage caused by the removal of the same.

### 24. CERTIFICATE BY TENANT

Tenant shall deliver to Landlord or to its mortgagees, auditors, or prospective purchaser, or to the owner of the fee, when reasonably requested by Landlord in writing, a certification to the effect that to Tenant's actual knowledge, this Lease is in full force and effect and that Landlord is not in default therein or stating specifically any exceptions thereto ("Estoppel Certificate"). Failure to give such a certificate within twenty (20) calendar days after written request shall be conclusive evidence that the Lease is in full force and effect and Landlord is not in default of any provisions thereof, and Tenant shall be estopped from asserting any defaults known to it at that time. Failure of Tenant to comply with such reasonable requests by Landlord shall be deemed an Event of Default.

### 25. REMEDIES CUMULATIVE

The various rights, remedies, powers and elections of Landlord reserved, expressed, or contained in this Lease, are cumulative and no one of them shall be deemed to be exclusive to the others or of such other rights, remedies, powers, options or elections as are now, or may hereafter be, conferred upon Landlord by law.

### 26. NO WAIVER OF PERFORMANCE

No waiver of Landlord of any provision hereof shall be deemed to have been made unless such waiver be in writing signed by Landlord. The failure of Landlord to insist upon the strict performance of any of the covenants or conditions of this Lease, or to exercise any option herein conferred, shall not be construed as waiving or relinquishing for the future any such covenants, conditions or options, but the same shall continue and remain in full force and effect. No act of Landlord or its agent during the term hereof shall be deemed an acceptance or a surrender of the Premises unless made in writing and personally subscribed by Landlord. Neither the delivery of the keys to the Premises by Tenant to Landlord or its agents is to be deemed a surrender and acceptance thereof. No payment by Tenant of a

lesser amount than the monthly Rent herein stipulated shall be deemed to be other than on account of the stipulated Rent.

### 27.    MUTUAL AGREEMENTS TO INDEMNIFY, INSURANCE

(a)    Tenants Indemnification.  Tenant shall indemnify and save Landlord harmless, and does agree to indemnify and save Landlord harmless, of and from all fines, claims, demands, and causes of action of every nature whatsoever arising or growing out of any manner connected with the occupation or use of the Premises, and every part thereof, by Tenant and the employees, agents, servants, guests and invitees of Tenant, including without limiting the generality of the foregoing, any claims, demands and causes of action for personal injury and/or property damage, and said indemnification shall extend to any liens, claims, demands, and causes of action of every nature whatsoever which may be made upon, sustained or incurred by Landlord by reason of any breach, violation of non-performance of any term, covenant, or condition hereof on the part of the Tenant, or by reason of any act of gross negligence or omission on the part of Tenant and the employees, agents, servants, guests and invitees of Tenant.  In any such event, comparative negligence on the part of the Landlord shall not in any way effect Tenant's obligation under this indemnification.  Tenant agrees that this indemnification shall further extend to all costs incurred by Landlord in connection with an indemnifiable event, including reasonable attorney's fees.

(b)    Landlord's Indemnification.    Landlord shall indemnify and save Tenant harmless, and does agree to indemnify and save Tenant harmless, of and from all fines, claims, demands, and causes of action of every nature whatsoever arising or growing out of or in any manner connected with the Premises, Building, and every part thereof  including without limiting the generality of the foregoing, any claims, demands and causes of action for personal injury and/or property damage, and said indemnification shall extend to any liens, claims, demands, and causes of action of every nature whatsoever which may be made upon, sustained or incurred by Tenant by reason of any breach, violation of non-performance of any term, covenant, or condition hereof on the part of the Landlord, or by reason of any act of gross negligence or omission on the part of Landlord and the employees, agents, servants, guests and invitees of Landlord.  In any such event, comparative negligence on the part of the Tenant shall not in any way effect Landlord's obligation under this indemnification.  Landlord agrees that this indemnification shall further extend to all costs incurred by Tenant, including reasonable attorney's fees.

(c)    Tenant's Insurance Requirements.  Tenant agrees that, at all times during the Term (as well as prior and subsequent thereto, if Tenant or its agents shall then use or occupy a portion of the Leased Premises), it shall keep in force, with a responsible insurance company licensed to do business in the State of Florida which shall have at least a Best's Rating of AA and otherwise be reasonably acceptable to Landlord, commercial general liability and property damage liability insurance in a combined single limit of not less than $3,000,000 covering death or injury to any person(s) as well as property damage.  Such policy shall include as additional insureds as their interests may appear the following:  Landlord, its managing agent (if any), the fee owner, Landlord's lender, if any, and any other such parties having an insurable interest as Landlord may designate as parties to be insured from time to time; and such policy shall be deemed (a) to be considered primary insurance; (b) include by endorsement an agreement insuring Tenant's indemnity and hold harmless obligations under this paragraph; (c) provide that it may not be canceled or changed without at least thirty (30) calendar days prior written notice from the insurer to each party insured thereunder; and (d) provide that the insurance company issuing the policy shall not have a right of subrogation against Landlord or its insurer.  Upon Landlord's request from time to time, Tenant shall furnish Landlord with either the original policy, or at Tenant's option, an endorsement of the insurance so carried by Tenant.  Tenant may maintain such insurance policies as part of blanket insurance policies which Tenant maintains for Tenant's sites throughout the United States.

19

(d)     Landlord's Insurance.   Landlord, at Landlord's expense, shall obtain and maintain throughout the Term (i) a Special Form – Causes of Loss property insurance policy (formerly known as "all-risk") (such insurance to include Landlord's Work) of fire and extended coverage insurance for the Building, including the Premises, against damage or destruction by fire and other casualties, such insurance to be in an amount equal to the full replacement cost, without depreciation, of the Building, and (ii) a policy of commercial general liability insurance against claims for personal injury, death and property damage occurring in or about the Building, such insurance to afford protection to the limits of (a) $1,000,000.00 in respect of injury to or death of any number of persons arising out of any one occurrence, and (b) $50,000.00 in respect of any instance of property damage.  Landlord shall deliver to Tenant, upon Tenant's request, endorsements of such insurance.

(e)     Waiver of Subrogation.   Landlord and Tenant each hereby waives all claims, rights of recovery and causes of action against the other party or against any of the other party's officers, directors, shareholders, partners or employees for any loss or damage that may occur to the Building, the Premises, any improvements thereto or any personal property therein by reason of fire or other casualty, or by reason of any other cause (including the negligence of a party hereto or its officers, directors, shareholders, partners or employees), that could have been insured against under the terms of a standard fire and extended coverage insurance policy or policies or for which Landlord or Tenant may be reimbursed as a result of insurance coverage affecting any loss suffered by either party hereto, regardless of cause or origin.  Landlord and Tenant hereby agree to cause an endorsement to be issued to their respective insurance policies (including any contents, fire and casualty insurance) recognizing this waiver of subrogation.

### 28.     NOTICES

(a)     Notice to Tenant.   Any notice by Landlord to Tenant shall be in writing and deemed to be duly given if either delivered personally to Tenant, three (3) calendar days after depositing into the United States mail system via registered or certified mail, or via overnight mail (e.g.., Federal Express), addressed to Tenant at:

| | |
|---|---|
| 2901 JMH, LLC | With copy to: |
| c/o JMH Development LLC | Stearns Weaver Miller Weissler |
| 184 Kent Avenue, Unit C706 | Alhadeff & Sitterson, P.A. |
| Brooklyn, NY  11249 | New River Center |
| Attention:  Jason Halpern | 200 East Las Olas Boulevard |
| | Suite 2100 |
| | Ft. Lauderdale, FL 33301 |
| | Attention:  George A. Pincus, Esq. |

(b)     Notice to Landlord.   Any notice of Tenant to Landlord shall be deemed duly given if delivered personally to Landlord, three (3) calendar days after depositing into the United States mail system via registered or certified mail, or via overnight mail (e.g. , Federal Express), addressed to Landlord (or at such other address as may hereafter be designated by Landlord and also to the agent of Landlord, if any, charged with the renting and management of the Building) at:

| | |
|---|---|
| Palm Court at 23rd Street, Ltd. | With copy to: |
| c/o Ronald Bloomberg | George E. McArdle, Esq. |
| 309 23rd Street, Suite 300 | McArdle, Perez & Franco, PL |
| Miami Beach, FL 33139 | 806 S. Douglas Rd. Ste. 625 |
| | Coral Gables, FL 33134 |

20



### 29.    SURRENDER AT EXPIRATION OF THE TERM

Tenant agrees at the expiration of the term to quit and surrender the Premises and everything belonging to or connected therewith in as good state and condition as reasonable wear and use thereof will permit, and to remove all signs, advertisements and rubbish from the said Premises.

### 30.    RULES AND REGULATIONS

Tenant agrees to observe and comply with and Tenant agrees that its agents, servants, employees and all persons visiting in the Premises will observe and comply with rules and regulations (the "Rules and Regulations") annexed hereto as Exhibit "C" and such other and further Rules and Regulations as Landlord may from time to time deem needful and prescribe for the reputation, safety, care and cleanliness of the Building and Land and the preservation of good order therein and the comfort, quiet, and convenience of all occupants of the Building.  Landlord agrees that the Rules and Regulations will be reasonable and will not interfere with Tenant's quiet enjoyment of the Premises during the business hours prescribed herein.  Notwithstanding the absence of any published Rule or Regulation, Tenant shall be deemed solely responsible for the acts of its employees and guests.  Any damage to any portion of the Land or Building caused by Tenant shall be the sole responsibility of the Tenant to correct and/or repair regardless of cost.  Failure to comply with any of the Rules and/or Regulations or any failure to correct or pay for any damage caused by the Tenant, its employees or guests shall be deemed an Event of Default.

### 31.    SIGNAGE

Tenant shall not construct any signs in or on the Premises or any other portion of the Building without first obtaining the express written permission from the Landlord (not to be unreasonably withheld).  All such letters and numerals shall be in the standard graphics as approved in writing by Landlord for the Building and no others shall be permitted on the Premises without the Landlord's prior written consent.  Any letters, names or numerals on the Building's directory board other than as set forth above shall be provided for and installed by Landlord at Tenant's sole expense.  Any signage to which Landlord may consent shall be in absolute compliance with all guidelines and standards as set forth by the City of Miami Beach Zoning Code now or in the future.  All signage detail shall be submitted by Tenant to Landlord for approval.  Tenant shall have the right to install Tenant's signage on the windows as depicted on Exhibit "D" attached hereto.  Landlord hereby approves such signage, provided Tenant obtains approval from all applicable governmental authorities.  Upon termination of the Lease, Tenant shall be required to remove all signage at its sole cost and expense.

### 32.    IMPROVEMENTS BY TENANT

In completing Tenant's Work and/or any Alterations to the Premises, Landlord and its agents have the right to inspect all work of Tenant and Tenant's contractor and Tenant shall employ only licensed contractors and sub-contractors; and all such work done by Tenant shall be performed and installed in such a manner that the same shall comply with all provisions of law, ordinances and all rules and regulations of any and all agencies and authorities having jurisdiction over the Building and Premises, and at such time and in such manner as not to interfere with progress of any work being performed by or on account of Landlord.  Notwithstanding the foregoing, in no event shall Tenant have the right to create or permit there to be established, any lien or encumbrances of any nature against the Premises or the Building for said improvements by Tenant, and Tenant shall fully and promptly pay the cost of any improvement or improvements made or contracted by Tenant.  It is further understood that Tenant shall be required to ascertain all requisite certificates of occupancy, completion and/or compliance to be issued by the City of Miami Beach to Tenant, and, Tenant shall be obligated to furnish copies

thereof to Landlord upon request thereof. Any and all notices of commencement and/or liens which may have been placed on the property by Tenant must be properly discharged.

### 33.    IMPROVEMENT OF THE DEMISED PREMISES

(a)    Tenants Improvement; Final Plans.    Tenant shall complete and prepare the Premises for Tenant's initial occupancy in a good, workmanlike and timely manner. The initial work to be performed by Tenant shall be referred to as "Tenant's Work" and shall be completed in accordance with the Final Plans (defined below). Complete detailed architectural and engineering plans, working drawings, and material specifications for the proposed Tenant's Work in the Premises (collectively all such items are referred to herein as the "Preliminary Plans") shall be prepared by Tenant's architect ("Tenant's Architect") and engineers and submitted to Landlord for its review and approval.    The Preliminary Plans shall be based on the Space Plan attached to this Lease as Exhibit "E" (the "Space Plan"), which has been approved by Landlord. The Preliminary Plans shall specifically include (i) fully dimensioned architectural plans; (ii) structural, mechanical, electrical, plumbing and plans for fire protection, and security equipment to the extent tied to the Building's structural, mechanical, electrical and plumbing systems; and (iii) all special equipment and fixture specifications. The Preliminary Plans shall reflect the Tenant's Work to the Premises to be made in compliance with all applicable zoning, land use, building and life safety laws applicable to the Building so that: (1) all required building permits can be obtained, based upon submittal of the Final Plans to the appropriate governmental authority, and (2) upon the proper completion of the Tenant's Work, all required certificates of occupancy can be issued by the governmental authority having jurisdiction over such matters. Within three (3) business days of Landlord's receipt of the Preliminary Plans (two (2) business days for resubmittals from Tenant), Landlord shall either (i) approve such Preliminary Plans in writing (in which case the Preliminary Plans shall be deemed to be the "Final Plans" for the Tenant's Work), or (ii) Landlord shall disapprove the Preliminary Plans, with specific written objections to same. Landlord shall be reasonable in its review and approval or disapproval of the Preliminary Plans. If Landlord fails to timely respond, then Landlord shall be deemed to have approved the Preliminary Plans entitling Tenant to proceed hereunder. Landlord shall limit its objection comments to matters which, based upon Landlord's familiarity with the Building, its construction and the mechanical, plumbing, HVAC and electrical systems of the Building, Landlord reasonably believes (i) there is a design or lay-out flaw in the Preliminary Plans, (ii) the proposed Preliminary Plans are not sufficient to obtain the required building permits or certificate of occupancy, or (iii) as presented the proposed Preliminary Plans are not in compliance with any applicable zoning, land use, building or life safety laws applicable to the Building.  Thereafter, Tenant will cause Tenant's Preliminary Plans to be revised to the extent necessary hereunder to obtain Landlord's approval and to be re-submitted for Landlord's approval.  Once the Final Plans are approved by Landlord, Tenant will send Landlord electronic copies of the Final Plans for Landlord's records.

(b)    Building Permits.    Landlord shall assist Tenant in attempting to revive the original building permit for the Premises (i.e. Permit # B0603774 (the "Original Permit")) originally ascertained by a prior occupant of the Premises through a third party general contractor. It is the intention of Tenant to re-activate the Original Permit for the completion of the Tenant's Work or if the Original Permit cannot be obtained then a new building permit (the "Interior Remodel Permit"). All costs and expenses associated with any permitting, either reviving the Original Permit, or securing the Interior Remodel Permit shall be borne by Tenant; provided, however, Landlord shall cooperate with Tenant in obtaining the Original Permit or the Interior Remodel Permit, as applicable.  Landlord shall receive no supervisory or other fees directly or indirectly for any of Tenant's Work to the Premises.

(c)    Tenant Responsible for Costs of Improvements.    Notwithstanding anything contained in the above referenced paragraph, it is expressly understood and agreed that Tenant shall be responsible for all costs and expenses of the Tenant's Work to the Premises. Upon completion of the

22

Tenant's Work, Tenant shall deliver to Landlord a temporary certificate of occupancy, together with a lien release for the Tenant's Work from Tenant's general contractor.

(d)     Landlord Not Liable For Delays.  Landlord shall not be subject to any liability as a result of the Tenant's Work not being timely competed.  The foregoing notwithstanding, if Tenant's application for the Original Permit or the Interior Permit is delayed due to Landlord's acts or omissions (a "Permit Matter"), then Tenant shall advise Landlord of the same and the Rent Commencement Date shall be extended on a day-for-day basis until Landlord cures the Permit Matter (as evidenced by Tenant obtaining the Original Permit or the Interior Permit, as applicable).  If Landlord is unable to cure the Permit Matter within thirty (30) days after Tenant notifies Landlord of the same, then Tenant shall have the right to terminate this Lease and Tenant shall be released from all obligations under this Lease. Notwithstanding the foregoing, if Tenant is unable to obtain the Original Permit or the Interior Permit, as applicable, through no fault of Tenant or Landlord within ninety (90) days following the Commencement Date, then Tenant shall advise Landlord of the same and Landlord shall have an additional thirty (30) days to obtain the Original Permit or the Interior Permit, as applicable, on Tenant's behalf.  If, after such thirty (30) day period, Landlord is unable to obtain the Original Permit or the Interior Permit, as applicable, then Tenant shall have the right to terminate this Lease and Tenant shall be released from all obligations under this Lease.

## 34.   LANDLORD'S INTEREST NOT SUBJECT TO MECHANICS LIENS AND REMOVAL OF LIENS

(a)     Landlord's Interest Not Subject to Liens.  All persons to whom these presents may come are put upon notice of the fact that Tenant shall never, under any circumstances have the power to subject the interest of Landlord in the Premises or any portion of the Building to any mechanics' or materialmen's lien or liens of any kind.  All persons who may hereafter, during the continuance of this Lease, furnish work, labor, services or materials to the Premises, or any portion of the Building upon the request or order of Tenant, or any person claiming under, by or through Tenant, must look wholly to the interest of Tenant and not to that of Landlord.

(b)     Tenant's Obligation to Remove Liens.  Tenant shall not permit or suffer to be filed or claimed against the Premises or any portion of the Building during the continuance of this Lease any lien or liens of any kind arising out of the action of Tenant, and if any such lien be claimed or filed, Tenant covenants, within the time limits set forth below, to cause the lien ("Claim"), either through the deposit into court pursuant to statute of the necessary sums of money, or in any other way which is competent legally to effect the release ("Release") of the Premises and/or the Building from the Claim of lien.  In the event that the Tenant shall violate the terms and provisions of this paragraph, such violations shall constitute an immediate Default under this Lease.  The time within which Tenant must affect such Release of the Premises and/or the Building, as aforesaid, is as follows:

(i)     If the Claim shall have been evidenced through the giving of a written notice of lien claim, and if such notice be filed amongst the Public Records of Miami Dade County, Florida, then Tenant shall commence efforts to effect such Release from such Claim within thirty (30) calendar days after the time when such Claim shall have been filed amongst the Public Records.

(ii)     If the Claim be evidenced, without notice having been given as aforesaid, through the filing of a suit in any court having jurisdiction of the subject matter, in which suit the Claim is asserted and sought to be enforced, then Tenant must commence efforts to effect the Release within ten (10) calendar days after the time when service of process shall have been completed against Tenant or Landlord in the suit.

23

(c)      Landlord Public Notice to Potential Lienors.  Landlord has recorded or may record a notice in the Public Records of Miami-Dade County, Florida, pursuant to Section 713.10, Florida Statutes, putting all potential lienors on notice of this section of the Lease.

### 35.      SECURITY

(a)      Prepaid Rent.  In addition to the other forms of Security set forth in this section and elsewhere in this Lease, Tenant shall pay to Landlord at Lease execution prepaid rent (the "Prepaid Rent") an amount equal to one month's gross Rent (including Tenants Proportionate Share of Building Operating Expenses and applicable sales tax, but less any parking charges if Tenant is not in immediate use or need for the parking as set forth elsewhere in this lease) in the aggregate amount of $17,814.97 (which amount includes applicable sales tax).

(b)      Security Deposit.  In addition to the Prepaid Rent, Tenant shall pay to Landlord, as additional security for the performance of Tenant obligations herein (the "Security Deposit") in an amount equal to two months gross rent of $35,629.94.

(c)      Forfeiture of Security.  If Tenant does not pay the Rent in accordance with this Lease beyond the prepaid rent period, or is in Default in other matters which cause Landlord monetary damage, Landlord shall have the right, but not the obligation, to draw upon the above Security Deposit to satisfy any Rent or other obligations of Tenant.  Landlord shall further have the right to seek from a Tenant a reimbursement of any monies drawn down from the Security Deposit to cover that portion of the Rent or other obligations not paid by Tenant.  Tenant's failure to make such Security Deposit reimbursement within five (5) days of the date written request is made by Landlord shall be deemed an Event of Default.  It is further agreed that in the event Tenant Defaults in respect of any of the terms, provisions and conditions of this Lease, including, but not limited to, the payment of Rent and Additional Rent, or in the performance of the diligent and expeditious build out of those portions of Premises deemed to be Tenant's responsibility, then under such circumstances, Landlord may draw down on the Security and use, apply or retain the whole or any part of the Security Deposit to the extent required for the payment of any Rent obligation for any sum which Landlord may expend or may be required to expend by reason of Tenant's Default in respect of any of the terms, covenants and conditions contained in this Lease, including, but not limited to, any damages or deficiency in the re-letting of the Premises, previous payment of commission in connection with the initial leasing the Premises and commission due for new leasing of the Premises, and such other damages accrued before or after summary proceedings or other re-entry costs incurred by Landlord.

(d)      Return of Security Deposit.  In the event the Tenant shall fully and faithfully comply with all of the terms, provisions, covenants and conditions of this Lease, all Security (less any Prepaid Rent) shall be returned to the Tenant after the date fixed at the end of the Lease, and after delivery of the entire possession of the Premises to Landlord in the condition required hereunder.  In the event of a sale by Landlord of the Leasehold and/or Building, of which the Premises form a part, Landlord shall have the right to transfer the Security to the vendee, and Landlord shall thereupon be released by Tenant from all liability for the return of such Security Deposit and Tenant agrees to look solely to the new Landlord for the return of said Security Deposit.  It is agreed that the provisions hereof shall apply to every transfer or assignment made of the Security Deposit to a new landlord.  Tenant further covenants that it will not assign or encumber the monies deposited herein as security and that neither Landlord nor its assigns shall be bound by any such assignment or encumbrance.  Landlord shall not be required to keep the security in a segregated account and in no event shall Tenant be entitled to any interest on the security.  The mortgagee holding a mortgage encumbering the Building shall not be responsible to Tenant for the Security Deposit in the event such mortgagee becomes the owner of the Building through foreclosure or by reason of a deed in lieu thereof.  Tenant agrees to look solely to

24

Landlord and not to look to any Mortgagee or Purchaser at any foreclosure sale or Grantee in a Deed given in lieu of foreclosure for the return of any Security Deposit given to Landlord unless Landlord has given such Deposit to any such entity.

(c)     Security Deposit and Prepaid Rent Summary.  The Prepaid Rent and Security Deposit shall be collectively referred to herein as the "Security".

(f)     Tenant's Completion Guaranty.  Tenant shall provide a completion guaranty (the "Completion Guaranty") guaranteeing the completion of Tenant's Work pursuant to that certain Completion Guaranty attached hereto as Exhibit "F".

## 36.    QUIET POSSESSION, OTHER COVENANTS, SELF HELP

(a)     Landlord Covenants.  That if and so long as no Default exists under this Lease by Tenant, then Tenant shall peacefully and quietly enjoy the Premises, subject, however, to the terms of this Lease.

(b)     Landlord's Warranty of Title.  Landlord hereby represents to Tenant as follows:

(i)     That Oceanside Resorts Inc., a Florida Corporation (hereafter "Master Lessor") is the fee simple owner of the Land underlying the Building;

(ii)     That Master Lessor has leased the Land underlying the Building and Premises to Landlord by virtue of a long-term ground lease (the "Master Lease") which is recorded in the public records of Dade County, Florida;

(iii)     That pursuant to the terms of the Master Lease, Landlord has full, absolute and unencumbered rights and authority to enter into this Lease with Tenant without any consent, authorization or approval of Master Lessor.

## 37.    COMMON AREAS

So long as no Event of Default exists, Tenant and Tenant's employees, agents, servants, customers and invitees shall have a non-exclusive right to use the Common Areas, including, but not limited to, the lobby, delivery facilities, walkways, common corridors, landscaped and planted areas, , elevators, stairways, and public restrooms (the "Common Areas") in common with the other occupants of the Building subject to the Rules and Regulations promulgated by Landlord from time to time. Excluded from this section are all roof areas, with the exception of roof areas for Tenant's HVAC equipment. Notwithstanding any provision of this Lease to the contrary, Landlord shall take no action, nor make any renovations or reconfigurations of the Common Area, that (i) breach the covenant of quiet enjoyment, (ii) interfere with Tenant's access to the Premises (iv) cause noise, fumes, debris, vibrations or other similar conditions that would materially affect Tenant's use at the Premises, or materially impair the visibility of the Premises from the adjacent public roads.

## 38.    BROKER

Landlord and Tenant each covenants, warrants and represents that no broker was instrumental in consummating this Lease, other than Centaur Realty Organization Inc., and principal Ronald Bloomberg ("Broker"). Landlord shall be responsible for the commission due to the Broker pursuant to a separate written agreement and Tenant shall have no liability for any commission to Broker. Each party agrees to

hold the other harmless from and against, and agrees to defend at its own expense, any and all claims for a brokerage commission from any other third party brokers other than Broker.

### 39.   TRANSFER BY LANDLORD/ESTOPPEL

In the event that the interest or estate of Landlord in the Land or Building shall terminate by operation of law or by bona fide sale or by execution or foreclosure sale, or for any other reason (none of which occurrences shall adversely affect Tenant's leasehold interest hereunder), then and in any such event Landlord shall be released and relieved from all liability and responsibility as to obligations to be performed by Landlord hereunder or otherwise on condition that Landlord's successor shall become liable and responsible to Tenant in respect to all such obligations of Landlord under this Lease and acknowledge same in writing to Tenant.

### 40.   TIME

The parties hereto agree that time is of the essence of this Lease and applies to all terms and conditions contained herein.

### 41.   COPIES OF LEASE

This Lease may be executed by the parties hereto in one or more counterparts each of which shall be an original and all of which constitute one and the same agreement.   Copies of this Lease or any amendment hereto certified by the parties to be true and correct shall be satisfactory evidence thereof for all purposes.

### 42.   SUCCESSORS

The terms and conditions of this Lease shall inure to the benefit of and be binding upon any successor or permitted assigns of any party hereunder, as well as upon the personal representatives, heirs, and all other successors in interest of the parties.

### 43.   CONSTRUCTION, SEVERABILITY, APPLICABLE LAW

The words "Landlord" and "Tenant" as used herein shall include the plural as well as the singular.   Words used in masculine gender include the gender and neuter.   If there be more than one Landlord or Tenant, the obligations imposed hereunder upon the Landlord or Tenant shall be joint or several.   The section headings or titles in this Lease are not a part hereof and shall have no effect upon the construction of interpretation of any part hereof.   Should any provisions of this Lease be illegal or unenforceable under such laws, it or they shall be considered severable and this Lease and its conditions shall remain in force and be binding upon the parties hereto just as though the illegal or unenforceable provisions had never been included herein.   The exclusive venue for resolution of any dispute arising out of, or in connection with this Lease shall be in Miami-Dade County, Florida.   The laws of the state of Florida shall govern any interpretation of this Lease.

### 44.   JOINDERS

The Tenant hereby agrees to join in any and all documents pertaining to this lease, the Land and/or Building, which are requested by Landlord from time to time.   This shall include, but not be limited to, land use plan amendments, zoning applications, development of regional impact applications and all other permits, applications and/or documents, to be filed with any governmental and/or quasi-

26

governmental authorities with respect to the development of all or any portion of the Building and/or property adjacent to the Building which may now or in the future be owned by Landlord.

## 45. ENTIRE AGREEMENT

This Lease contains the entire agreement between the parties hereto and all previous negotiations leading thereto, and it may be modified only by an agreement in writing signed and sealed by Landlord and Tenant. No surrender of the Leased Premises, or of the remainder of the terms of this Lease, shall be valid unless accepted by landlord in writing. Tenant and Landlord acknowledge and agree that neither has relied upon any statement, representation, prior written or prior or contemporaneous oral promises, agreements or warranties except such as are expressed herein.

## 46. TYPEWRITTEN AND HANDWRITTEN PROVISIONS

To the extent that any portions of the handwritten provisions, or amendments to this Lease conflict with the typewritten provisions, or amendments to this Lease conflict with the typewritten provisions, then in all events, the handwritten provisions shall prevail.

## 47. TENDER AND DELIVERY OF LEASE INSTRUMENT

Submission of this instrument for examination does not constitute an offer, right of first refusal, reservation of or option for the Leased Premises or any other space or premises in, on or about the Building. This instrument becomes effective as a Lease upon execution and delivery by both Landlord and Tenant.

## 48. NO PARTNERSHIP

Nothing contained in this Lease shall be deemed or construed to create any other relationship between the parties hereto other than that of Landlord and Tenant.

## 49. PARKING

(a)     Parking and Parking Passes. Landlord shall at all times during this Lease, have access to certain municipal parking passes (the "Municipal Parking Passes") which shall give access to City of Miami Beach ("City") parking on the street or in a City owned parking lot (the "City Parking Facilities"). Landlord shall, at an additional cost, provide to Tenant not less than five (5) Municipal Parking Passes, which will enable Tenant to park at any City Parking Facility within proximity to the Property as depicted on Exhibit "G". Only Tenant and its direct employees shall be permitted to use the parking privileges set forth herein. Tenant shall have no obligation to lease all or any portion of the Municipal Parking Passes.

(b)     Cost of Pass. The cost of each parking pass shall initially be set at $150.00 per month plus applicable sales tax per pass and shall remain this price unless otherwise changed in the reasonable discretion of Landlord from time to time during the Term of this Lease or if the cost of the Municipal Parking Passes are increased as a result of any change in price of parking as promulgated by City ordinance. Landlord warrants however that the price shall not be increased during the first Lease Year but shall automatically increase by 5% commencing with the second Lease Year and each Lease Year thereafter unless otherwise notified by Landlord. Landlord may in its discretion, provide, at additional cost to Tenant, other means of parking for Tenant's use. Such other means of parking may also be in areas proximate to the Building, including but not limited to the parking lot located across the street from Building in the lot located at 340 23rd Street (the "340 Lot"). Parking in this lot will be set at an

27

initial rate of $175 per month plus applicable sales tax. All parking charges shall be deemed Additional Rent as that term is defined herein.

(c)     Restrictions on Use. All matters related to Tenant's parking as same pertains to this section, including the issuance of the Municipal Parking Passes, shall at all times be subject to certain parking use restrictions as may be presented to Tenant from time to time during the term of this Lease and as may be promulgated by City or Landlord for the use of such Passes ("Parking Use Restrictions"). Tenant agrees it shall cause any of its employees so issued said parking rights to abide by such terms if as and when such Parking Use Restrictions are presented to Tenant.

### 50.     LEASE NOT TO BE RECORDED

Tenant shall not record this Lease or any memorandum of its terms. In addition to all other rights and remedies available to Landlord, Landlord shall specifically have the right to injunctive relief to cause any memorandum in violation of this provision to be vacated of record.

### 51.     MISCELLANEOUS

(a)     All of the parties have participated fully in the negotiation and preparation hereof; and, accordingly, this Lease shall not be more strictly construed against any one of the parties hereto.

(b)     Neither Landlord nor Tenant shall divulge the contents of this Lease to any other party (other than their attorneys and other agents) except as required by Law.

### 52.     LIST OF EXHIBITS

All Exhibits, which are attached hereto, are incorporated into this Agreement by reference and constitute a part hereof.

SIGNATURE PAGE TO FOLLOW

28



IN WITNESS WHEREOF, the respective parties have hereunto set their hands and seals and caused these presents to be executed by their duly authorized officers the date set forth below.

Witnesses:

_____
As to Landlord

_DoNNA Bloomberg_____
Print Name

_____
As to Landlord

_Albert GoNZalez_____
Print Name

**LANDLORD:**

PALM COURT AT 23RD STREET, LTD., a
Florida limited partnership

By:  Palm Court Inc. (its General Partner)

By: _____
Name: _____ Ron Bloomberg
Title: _____ President
Date: _____ 11-2-15


Witnesses:

_____
As to Tenant

_Jeffry Pumkin_____
Print Name

_____
As to Tenant

_Jerlyn Jimenez_____
Print Name

**TENANT:**

2901 JMH, LLC, a Delaware limited liability
company

By: _____
Name: _____ Jasco Madisan
Title: _____
Date: _____ 10|30|15

29

## EXHIBIT A

## LEASED PREMISES (AREAS "A", "B", "C" "D")



# EXHIBIT A-1

## AREA A



Exhibit A-1

## EXHIBIT A-2

### AREA B





Exhibit A-2

## EXHIBIT A-3

### AREA C



Exhibit A-3

### EXHIBIT A-4

**AREA D**



Exhibit A-4

EXHIBIT B

BASE RENT SCHEDULE

| LEASE YEAR | ANNUAL BASE RENT | MONTHLY BASE RENT |
|---|---|---|
| 1-2 | $164,750.00 | $ 13,729.00 |
| OPTION PERIOD | | |
| 3 | $172,987.50 | $14,415.63 |

*The foregoing amounts do not include applicable sales tax which shall also be due by Tenant with each payment of Base Rent

Exhibit B

## EXHIBIT C

### RULES AND REGULATIONS

1.      Tenant, its officers, agents, servants and employees shall not block or obstruct any of the entries, passages, doors, elevators, elevator doors, hallways or stairways of Building or place, empty or throw any rubbish, litter, trash or material of any nature into such areas, or permit such areas to be used at anytime except for ingress and egress of Tenant, its officers, agents, servants, employees, patrons, licensees, customers, visitors or invitees.

2.      Except as set forth in this Lease, no sign, door plaque, advertisement or notice shall be displayed, painted or affixed by Tenant, its officers, agents, servants, employees, patrons, licensees, customers, visitors or invitees in or on any part of the outside or inside of Building, or Leased Premises without prior written consent of Landlord, such consent to be unreasonably withheld and then only of such color, size, character, style and material and in such places as shall be approved and designated by Landlord.

3.      Landlord will not be responsible for lost or stolen property, equipment, money or any article taken from Leased Premises, Building or common facilities regardless of how or when loss occurs unless as a result of the Landlord's gross negligence

4.      Tenant, its officers, agents, servants, and employees shall not install or operate any refrigerating, heating or air conditioning apparatus (other than that which is part of the Premises as of the Effective Date or otherwise approved by Landlord as set forth in the Space Plan and/or the Final Plans) or carry on any mechanical operation or bring into Leased Premises, Building or common facilities any inflammable fluids or explosives without written permission of Landlord.

5.      Tenant, its officers, agents, servants or employees shall not use Leased Premises, Building or common facilities for housing, lodging or sleeping purposes or for the cooking or preparation of food without the prior written consent of Landlord.

6.      No additional locks shall be placed on any door in Building without the prior written consent of Landlord such consent not to be unreasonably withheld. Landlord will furnish two keys to each lock on doors in the Leased Premises and Landlord, upon request of Tenant, shall provide additional duplicate keys at Tenant's expense. Landlord may at all times keep a pass key to the Leased Premises. All keys shall be returned to Landlord promptly upon termination of this Lease.

7.      Landlord reserves the right to close Building at 7:00 P.M., subject, however, to Tenant's right to admittance under regulations prescribed by Landlord, and to require that persons entering the Building identify themselves and establish their right to enter or to leave the Building. This rule notwithstanding, Tenant shall be permitted access to its leased Premises at all time during the year.

8.      All plate and other glass appurtenant to the Leased Premises which may be broken or damaged through cause attributable to Tenant, its officers, agents, servants, employees, patrons, licensees, customers, visitors or invitees etc. shall be replaced by and at expense of Tenant under the direction of Landlord.

9.      Notwithstanding Tenant's obligations of repair under the Lease, Tenant shall give Landlord prompt notice of all accidents to or defects in air conditioning equipment, plumbing or electric facilities or any part or appurtenance of Leased Premises.

10.     The plumbing facilities shall not be used for any other purpose than that for which they are constructed, and Tenant shall incorporate best efforts to ensure no foreign substances of any kind shall be thrown therein, and the expense of any breakage, stoppage, or damage resulting from a violation of these

Exhibit C

provisions shall be borne by Tenant, who shall, or whose officers, employees, agents, servants, patrons, customers, licensees, visitors or invitees shall have caused it.

11.     All contractors and/or technicians performing work for Tenant within the Leased Premises or Building shall be referred to Landlord for approval before performing such work, such approval not to be unreasonably withheld.   This shall apply to all work including, but not limited to, installation of telephones, telegraph equipment, electrical devices and attachments, and all installation affecting floors, walls, windows, doors , ceilings, equipment or any other physical feature of the Building or Leased Premises. None of this work shall be done by Tenant without Landlord's prior written approval.

12.     No space in the Building shall, without the prior written consent of the Landlord, be used for manufacturing, public sales, or for the storage of merchandise, or for the sale of merchandise, goods or property of any kind, or auction.

13.     Canvassing, soliciting, and peddling in the Building is prohibited and each Tenant shall cooperate to prevent the same.   In this respect, Tenant shall promptly report such activities to the building Manager's office.

14.     There shall not be used in any space, or in the public halls of the Building, either by any tenant or by jobbers of others, in the delivery or receipt of merchandise, any hand trucks, except those equipped with rubber tires and side guards.

15.     Neither Tenant nor any officer, agent, employee, servant, patron, customer, visitor, licensee or invitee of any tenant shall go upon the roof of the Building without the written consent of the Landlord.

16.     In the event Tenant must dispose of crates, boxes, etc., which will not fit into office wastepaper baskets, it will be the responsibility of Tenant to dispose of same. In no event shall Tenant set such items in the public hallways or other areas of the Building or Building Common Areas, excepting Tenant's own Premises, for disposal.

17.     Tenant will be responsible for any damage to the Leased Premises, including flooring, as a result of rust or corrosion of file cabinets; roller chairs, metal objects; or, spills of any type of liquid caused by Tenant or Tenant's agents and guests etc.

18.     If the Premises demised to any Tenant become infested with vermin, such Tenant, at its sole cost and expense, shall cause its premises to be exterminated from time to time, to the satisfaction of Landlord, and shall employ such exterminators therefor as shall be approved by Landlord.

19.     Tenant shall not install any antenna or aerial wires, or radio or television equipment, or any other type of equipment, inside or outside of the Building, without Landlord's prior approval in writing, such approval not to be unreasonably withheld.

20.     In case Landlord shall, in the exercise of any right herein granted, store any personal property, belonging to Tenant, Landlord shall have the further right to dispose of such property by sale or otherwise upon two weeks' notice in writing for that purpose.  If Landlord shall sell any such property, Landlord shall be entitled to retain from the proceeds thereof the expenses of the sale and cost of storage.

21.     Subject to the terms of the Lease, Landlord shall have the right to prohibit any advertising by Tenant which in Landlord's opinion is intentionally harmful or disparaging to the Landlord, the Building, its reputation or its desirability as an office Building.   Tenant shall discontinue such advertising immediately upon written notification by Landlord.

Exhibit C

22.    Subject to the terms of the Lease, Landlord reserves the right to modify the foregoing rules and regulations, or any of the them, and to make such other and further rules and regulations as in its absolute judgment may from time to time be needful for the reputation, safety, care and cleanliness of the Building, and for the preservation of good order therein, and any such other and further rules and regulations shall be binding upon the parties hereto with the same force and effect as if they had been inserted at the time of the execution hereof.

Exhibit C

## EXHIBIT D

**SIGNAGE - TENANT'S SIGNAGE**



## EXHIBIT E

## TENANT'S SPACE PLAN TO THE PREMISES



Exhibit E

## EXHIBIT F

## COMPLETION GUARANTY

## GUARANTY OF LEASE

This Guaranty of Lease (this "Guaranty") is given this ___ day of October, 2015, by **JASON HALPERN** ("Guarantor"'), whose address is 184 Kent Ave., C 706, Brooklyn, NY 11249, in conjunction with that certain lease, dated as of even date herewith (the "Lease") by and between **PALM COURT AT 23RD STREET, LTD.**, a Florida limited partnership ("Landlord") and **2901 JMH, LLC**, a Delaware limited liability company ("Tenant"), for the "Leased Premises" located at Suite 100 in "Palm Court", situated on that parcel of land (the "Land"), whose general address is 309 23rd Street, Miami Beach, Miami-Dade County, Florida, as defined in the Lease.

## RECITALS:

A.     In order to induce Landlord to enter into the Lease and as additional security for Tenant's performance of the terms and conditions of the Lease and Tenants payment of the Rent (as defined in the Lease) to be paid by Tenant under the Lease, Tenant has agreed to procure and deliver to Landlord this Guaranty to be executed by Guarantor whose address is 184 Kent Ave, C 706 Brooklyn, NY 11249.

B.     Guarantor is a principal of Tenant, and Guarantor will substantially benefit, economically and otherwise, from Landlord entering into the Lease with Tenant.

C.     Landlord has refused to enter into the Lease unless this Guaranty is executed by Guarantor and delivered to Landlord and this Guaranty is a material inducement to Landlord in connection with Landlord's entering into the Lease with Tenant on the terms and conditions set forth in the Lease.

NOW, THEREFORE, in consideration of the Demised Premises herein, in the Lease and of the sum of TEN & NO/100 DOLLARS ($10.00) paid to Guarantor by Landlord, the receipt and adequacy whereof is hereby acknowledged, and as part of the consideration for the execution by Landlord of the Lease with Tenant, Guarantor hereby covenants and agrees with Landlord as follows:

1)     Guarantor guarantees to Landlord the due and prompt performance by Tenant of "Tenant's Work" (as such term is defined in Section 33(a) of the Lease), in accordance with and subject to the terms and conditions of the Lease, including, without limitation, any applicable notice and cure periods and the completion of Tenant's Work on or before the end of the Lease Term or sooner termination of the Lease (collectively the "Guaranteed Obligations").

2)     Guarantor hereby acknowledges and consents that the terms, covenants and conditions contained in the Lease and related documents may be altered, extended, changed, modified or released by Tenant, with the approval of Landlord, without in any manner affecting this Guaranty or releasing Guarantor herefrom, or without the consent of Guarantor, except that the Guaranteed Obligations may not be expanded without the prior written consent of Guarantor. Landlord shall be required to send copies of all notices sent to Tenant to the Guarantor at the address set forth above. Guarantor shall have the same notice and opportunity to cure rights as that of Tenant as set forth in the Lease; provided, however, in the event that notice is sent to Guarantor after such notice is sent to Tenant, then Guarantor shall have the full amount of time to cure set forth in the Lease commencing on the date that Guarantor is deemed to have received such written notice (e.g., if Guarantor receives written notice of default 3 days after such notice is deemed received by Tenant, then Guarantor shall have 3 additional days to cure such default).

3)      Notwithstanding anything to the contrary contained in the Lease, Landlord acknowledges and agrees that Tenant's and/or Guarantor's delivery to Landlord of (a) a temporary or permanent certificate of occupancy for the Leased Premises, and (b) a waiver and release from Tenant's general contractor (collectively, the "Completion Documents"), shall evidence the satisfaction and completion of Tenant's Work, whereupon all of the terms, covenants and conditions of this Guaranty shall be deemed fully performed and Guarantor shall be released from its obligations hereunder. Notwithstanding the foregoing if Tenant is released of its obligation under the Lease to complete the Tenant Work, Guarantor's obligations hereunder shall automatically cease.

4)      Any notice, demand or request by Landlord to Guarantor shall be in writing and shall be deemed to have been duly given or made if either delivered personally to Guarantor or if mailed by registered mail or certified mail, return receipt requested, at the aforementioned address.

5)      This Guaranty shall inure to the benefit of Landlord, its successors and assigns, and shall bind Guarantor and its legal representatives, successors and assigns.

6)      This Guaranty constitutes the entire agreement between Guarantor and Landlord covering the subject matter hereof.

7)      If at any time or times hereafter Landlord employs counsel to intervene, or to file a petition, answer, motion or other pleading in any suit or proceeding relating to this Guaranty, then in such event, all of the reasonable attorneys' fees and out-of-pocket costs relating thereto and other costs of collection, shall be an additional liability of Guarantor to Landlord, payable within thirty (30) days after written demand if Landlord is the prevailing party in such action. If Landlord is not the prevailing party Landlord shall reimburse Guarantor for its reasonable attorneys fee and out-of-pocket costs relating thereto within thirty (30) days after written notice.

8)      Guarantor represents and warrants to Landlord that: (a) upon the execution and delivery of this Guaranty it is fully enforceable against Guarantor in accordance with its terms, subject to bankruptcy or other equitable principles, (b) that the execution and delivery of this Guaranty does not violate or constitute a breach of any agreement to which Guarantor is a party or of any applicable laws, and (c) Guarantor has knowledge of Tenant's financial condition and affairs and will hereafter keep informed of Tenant's financial condition so long as this Guaranty is in force.

9)      Guarantor hereby waives and agrees not to assert or take advantage of (a) the defense of that statute of limitations in any action relating to Tenant, (b) any defense that may arise by reason of the incapacity, lack of authority, death or disability of Guarantor or any other person or entity, or the failure of Landlord to file or enforce a claim against the estate (either in administration, bankruptcy, or any other proceeding) of Tenant or any other person or entity, (c) any defense based on the failure of Landlord to give notice of the existence, creation or incurring of any new or additional indebtedness or obligation or of any action or non-action on the part of any other person whomsoever, in connection with any obligation hereby guaranteed, (d) any defense based upon an election of remedies by Landlord which destroys or otherwise impairs any subrogation rights of Guarantor or the right of Guarantor to proceed against Tenant for reimbursement, or both, (e) any defense based upon failure of Landlord to commence an action against Tenant, (f) other than for Landlord's failure to send notice required herein to Guarantor, any failure on the part of Landlord to disclose to Guarantor any facts it may now or hereafter know regarding Tenant, (g) any failure to receive acceptance or notice of acceptance of this Guaranty by Landlord, (h) other than for Landlord's failure to send notice required herein to Guarantor, any failure to give notice of presentment and demand for payment of any of the indebtedness or performance of any of the obligations hereby guaranteed, (i) any failure to give protest and notice of dishonor or of default to Guarantor or to any other party with respect to the indebtedness or performance of obligations hereby guaranteed, and (j) any defense based on lack of due diligence by Landlord in collection, protection or realization upon any collateral securing the indebtedness evidenced by the Lease.

Exhibit F

10) This Guaranty is assignable by Landlord but only to the extent of Landlord's rights and obligations under the Lease and any assignment hereof or any transfer or assignment of the Lease by Landlord shall not require the consent of Guarantor, provided Landlord shall provide Guarantor with written notice of any such assignment simultaneously with such assignment.

11) This Guaranty shall be construed, interpreted, enforced and governed by and in accordance with the laws of the State of Florida. The parties agree that proper venue for the purposes of enforcing the terms of this Guaranty shall lie in Miami-Dade County, Florida.

12) Guarantor is jointly and severally liable with Tenant and any other guarantors of the Lease with respect to the Guaranteed Obligations.

13) Guarantor and Landlord by its acceptance hereof, each waives trial by jury in any litigation, dispute or other action arising out of or in any way connected with this Guaranty.

[EXECUTION PAGES FOLLOWS]

Exhibit F



IN WITNESS WHEREOF, Guarantor has duly executed the Guaranty this 30th day of October, 2015.

Guarantor:

**JASON HALPERN**

STATE OF NEW YORK   )
                    ) ss.:
COUNTY OF Suffolk   )

The foregoing instrument was acknowledged before me this 30th day of October, 2015, by JASON HALPERN, who is (check one) ✓ personally known to me or _____ has produced _____ as identification.

BRIAN G. BROWN
Notary Public, State of New York
No. 01BR6151227
Qualified in Suffolk County
Commission Expires August 14, 2018

_____
(Signature of Person Taking Acknowledgment)

_____
(Name of Acknowledger Typed, Printed or Stamped)
_____ (Title or Rank)
_____ (Serial Number, if any)

Acknowledged and Agreed:

**PALM COURT AT 23RD STREET, LTD.,**
a Florida limited partnership

By: _____
Name: _____ Ron Bloomberg
Title: _____ President

Exhibit F

## EXHIBIT G

### PARKING FACILITIES

# Collins Park Garage Construction Temporary Parking Plan



**METERS** ▨

**METERS AVAILABLE UNTIL** ▨
**CONSTRUCTION BEGINS**

#4511156 v9

Exhibit G





# EXHIBIT B

# McArdle, Pérez & Franco, P.L.
## ATTORNEYS AT LAW

806 S. Douglas Road, Suite 625
Coral Gables Florida, 33134

GEORGE E. McARDLE, ESQ.

Telephone:  (305) 442-2214
Facsimile:  (305) 442-2291
E-mail:  gmcardle@mcper.com

July 15, 2016

VIA CERTIFIED MAIL AND
FEDEX OVERNIGHT

Attn: Jason Halpern
2901 JMH, LLC
c/0 JMH Development LLC
184 Kent Avenue, Unit C706
Brooklyn, NY 11249

George Pincus, Esq.
Stearns, Weaver Miller, Weissler, Alhadeff & Sitterson, P.A.
New River Center
200 East Las Olas Boulevard, Suite 2100
Ft. Lauderdale, FL 33301

Re:     Lease between Palm Court at 23rd Street, LTD. and
        2901 JMH, LLC for space located at
        309 23 Street, Miami Beach, FL 33139,
        dated October 30, 2016 (the "Lease")

Dear Mr. Halpern:

The undersigned represents Palm Court at 23rd Street, LTD. (the "Landlord") with respect to the Lease.  This letter shall serve as formal notice to 2901 JMH, LLC (the "Tenant"), under section 17 of the Lease, that Tenant is in default under the Lease as follows:

1.  Tenant has failed to commence construction for the required Tenant Improvements as provided in Section 33 of the Lease; and

2.  Tenant performed demolition work on the leased premises without obtaining the required permit in contravention of Section 8 of the Lease.

This letter is formal notice of the above defaults under the Lease. Tenant shall have the cure period as provided in the Lease.

Pursuant to Section 28 of the Lease, this letter is being sent by certified mail and Fedex to the addresses listed on the Lease.

Sincerely,

George E. McArdle. Esq.